### ROGERS et al. v. FITCH et al.

(Circuit Court of Appeals, Second Circuit. July 21, 1897.)

PATENTS—ANTICIPATION—BED MATTRESSES.

The Fulton patent, No. 322,366, for a spring mattress, having a rabbeted circumference, so that the flange thus formed may rest upon the rails or sides and ends of the bed frame, while the lower part is suspended between and below the rails, is void in view of the Elston patent, No. 271,062. 77 Fed. 885, reversed.

Appeal from the Circuit Court of the United States for the Southern District of New York.

This is an appeal from an interlocutory decree of the circuit court, Southern district of New York, which held that defendants had infringed complainants' patent, and ordered an injunction and accounting. The patent in question is No. 322,366, issued to Samuel Fulton, July 14, 1886 (upon application filed May 12, 1884), for an improvement in mattresses. The first claim only was alleged to be infringed.

Fredk. Betts and Robt. G. Monroe, for appellants.

Jas. A. Whitney, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge.	Spring mattresses are necessarily made of a depth sufficient to admit of the play of the springs vertically between their base and the stuffed superstructure which they support.	The old-fashioned wooden bedstead is constructed with side boards or frames which are of considerable depth, and the cross slats between those side boards may be located, if desired, near the bottom of the side boards, so that when the deep spring mattress (or "spring," as it is commonly called in art) is placed upon the slats it will not project so far above the bed frame as to be unsightly or inconvenient.	The brass or iron bedstead, however, is not constructed with deep side frames, and a spring could not be rested upon cross slats between the side frames of such a bedstead without projecting too far above the bed frame.	The patentee's conception was to make the spring with a rabbeted circumference at an appropriate height above the base of the springs, so that the flange thus formed may rest upon the rails or sides and ends of the bed frame, while the lower portion is suspended between and below the rails.	The specification sets forth that:

"The object of this invention is to provide a mattress which, when placed in position upon a bedstead or equivalent support, will maintain all the advantages incident to the usual or normal thickness of the mattress itself, without the undesirable height incident to the use of mattresses of ordinary construction.	This object I accomplish by means of my said invention, which comprises a mattress having a rabbeted circumference so formed and arranged that when the mattress is placed in position upon a bedstead the lower portion thereof will sink within or below the rails of the bedstead, thereby permitting only a small portion of the thickness of the mattress to extend above the rails, so that by this means no material additional height is given to the bed by the placing of the mattress upon the bedstead, and the bed, considered as a whole, is made much more compact than if the mattress were placed bodily upon the rails, with its whole thickness extended above the same."

Referring to the drawings, the patentee proceeds:

"A is the upper circumferential frame of the mattress, made of wood or other suitable material.	B is the lower circumferential frame thereof, of less diameter and width.	This lower frame is connected with the upper by iron hangers, C, attached to the frames, respectively, by screws or other suitable means, in such

Fig. 1.

manner that the lower frame is suspended from the upper. Attached to the lower frame, B, are cross-bars, E, which support spiral springs, F, the upper ends of which are connected by any suitable lacing or other means ordinarily used for connecting the tops of springs and spring beds, and have placed above them the usual top, G, composed of any suitable fabric or fabrics, and with or without a topping or filling of hair or other material. * * * The width and length of the frame, B, bears such relations to the dimensions of the frame, A, that when the mattress is applied to the bedstead the frame, A, will rest upon the rails thereof with the frame, B; that is to say, the lower part of the mattress depressed between the said rails, and extending, when desired, below said rails. It is, of course, to be understood that, so far as concerns the principal feature of my invention, I do not limit myself to the precise construction of the parts therein shown, or the precise means of connecting said parts together; the essence of my invention consisting in a mattress circumferentially rabbeted in such manner that, while its upper portion may be supported by the bedstead, its lower and depressed part will be suspended from its upper portion, and situated below the level of the top of the frame of the bed. It will be observed that the mattress constructed to be placed upon the bedstead, as aforesaid, has as its most characteristic feature the deep rabbet around its circumference, so that a circumferential shoulder, a, is formed above for resting upon the rails, c, of the bedstead, while the lower portion, b, is suspended between and below the rails."

The bedstead shown in the patent is the ordinary iron or brass bedstead, it not being necessary, as complainants' expert testifies, to devise a bedstead with novel features for the use of such a mattress as the patent describes. The claims are:

"(1) As a new article of manufacture, a mattress for bedstead, the circumference of which is rabbeted, to enable it to be supported at its upper part by the rails of the bedstead, with its lower part suspended between said rails; all substantially as and for the purpose herein set forth. (2) The combination of the upper frame, A, the lower frame, B, of smaller dimensions, suspensory hangers, C, bars, E, and springs, F, the frames, B and A, being arranged in relation to each other to provide a circumferential rabbet, f, to the mattress, and to enable the lower part of the mattress to be suspended from the upper; all substantially as and for the purpose herein set forth."

The examiner decided that there was "nothing patentable in the claims in this case, in view of the following references: Elston, 246,378, Aug. 30, 1881, and Hale, 271,062, Jan. 23, 1883." The patent to Elston is for an improvement in railroad car seats. It shows a lower frame, supporting slats, on which the springs rest, and which drops below the level of the stationary frame of the car seat, whereby the patentee is "enabled to use springs of eight inches, more or less, in height, in addition to the ordinary three and a half inch springs." The drawings show clearly what Elston calls his "drop frame," and they show that this frame is shorter and narrower, and that it rests below the upper frame, which is supported all around (at the ends as well as the sides) upon the side and end rails of the stationary car-seat frame. A circumferential rabbet is thus formed, or, in the language of the patent in suit, "a circumferential shoulder is formed above for resting upon the rails" of the stationary car-seat frame; and the "drop-down frame" is held between and below the said rails. From the decision rejecting the patent, Fulton appealed to the board of examiners in chief. After citing the two references, the board held:

"Neither shows a mattress, but spring seats for railroad chairs. These seats show the rebate and spring, but applicant makes no claim to these per se, but

to a mattress for bedsteads. To permit of the use of such a mattress, a bedstead with novel features had to be devised, set forth in the second claim. They belong together as inventions, and support each other as to patentability. 'The bedstead would have no particular advantage with its two frames, A and B, and hangers, C, and bars, E, separate from the mattress, and the mattress would have no advantage from its rebate without the bedstead. Yet both could be used independently. The invention is not anticipated, and the decision is reversed."

—And patent issued accordingly.

.This is a most extraordinary decision. It was not necessary to devise "a bedstead with novel features" to permit the use of such a mattress; nor did Fulton assert in his specification that he had devised any bedstead; nor did he claim any bedstead, in combination or otherwise, in his second claim; nor did he ever refer to any bedstead in such claim. Moreover, the "two frames, A and B, and hangers, C, and bars, E," which the examiners in chief say belong to the bedstead, are really parts of the mattress, and so described in the patent. In view of the fact that the examiners in chief seem not to have had the remotest conception of what the specification showed, or of what Fulton claimed, the presumption in this case of patentability arising from the allowance of the application by the patent office is of no practical value.

Complainants seek to eliminate the Elston patent from the case by the suggestion that the workmen who make mattresses for beds do not make seats for railroad cars. That circumstance, however, is immaterial when an old contrivance is applied in an old way to an analogous subject, without any novelty in the mode of applying such old contrivance to the new purpose. Pennsylvania R. Co. v. Locomotive E. S. T. Co., 110 U. S. 497, 498, 4 Sup. Ct. 220; Aron v. Railway Co., 132 U. S. 89, 10 Sup. Ct. 24; Briggs v. Ice Co., 8 C. C. A. 483, 60 Fed. 87.

Complainants, in rebuttal, also undertook to prove that Fulton's invention was complete before the date of Elston's patent, which, it will be remembered, was August 30, 1881. Of course, the burden of proof on this branch of the case rested upon the complainants. Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 492, 11 Sup. Ct. 846. The witnesses called were George Smith and Louis Weber, who were examined on November 30, 1896. Smith testifies that he went into the employ of Charles P. Rogers, for whom Fulton was superintendent, on May 6, 1881; that "about five weeks afterwards" Fulton, in his presence, told Fred Weber he would like to get a frame out that would have a rabbet on it; that a frame was produced in a little over a week which was not exactly what Fulton wanted; that it was taken apart, and another one made, which contained the rabbeted edge around the mattress. He fixes the date when this mattress was completed as "somewhere about the middle of August, 1881" (which would antedate Elston by barely two weeks); that he did not know what became of this mattress, but that they did not make any others like it until November, 1882. This evidence as to dates is given wholly from his unaided memory, with no reference to any records, or to any collateral circumstance except his going into Rogers' employment; and he was not quite 18 years old when the events took place, which he thus undertakes, 15 years afterwards,

to locate within 2 weeks. The other witness, Louis Weber, who is a brother of the Fred Weber referred to by Smith, testified that when "he came into the factory at nine o'clock on the morning of August 20, 1881, he saw his brother (now deceased) and Fulton looking at the spring bed" which had the rabbeted edge of the patent. He never saw it again, nor any like it, until they began to manufacture them for sale, which he thinks was in 1884,—two years later than the date given by Smith. The witness Weber seems to have been ill on several occasions, so that he had to leave the factory for brief periods, but is unable to fix the dates of any such departures or returns, other than the one referred to, nor was he able to say whether he was first employed by Rogers on the first or on the second Tuesday in November, 1879. Without any book, record, or document of any kind, however, he 'asserts that he saw the mattress on August 20, 1881, and says he fixes the date because it was the year of President Garfield's assassination, and he "came back on that day after being sick." "I attended a tea-party," says the witness, "on the 19th of August, and came home on the 6 o'clock train that evening. That is how I remember it." Such evidence as this is not calculated to inspire confidence in the accuracy of the witnesses' recollection as to the dates of transactions 15 years old. The inventor, Fulton, died before the rebuttal testimony was taken; but it is most suggestive that when he was examined in complainants' behalf on the prima facie case his attention was called to the Elston patent, and he was asked if it anticipated his patent, to which he replied with an elaborate statement of structural differences, but with no suggestion of the pertinent fact that he had perfected his own invention on August 20, 1881,—prior to the granting of the Elston patent. We should be inclined to hold that complainants have not sustained the burden of proving that Fulton's mattress antedated the Elston patent, but really it is not necessary to include the latter patent within the prior art. The patent to T. R. Jones for a spring-bed bottom, April 3, 1877, shows a mattress in which the upper frame projects at the head and foot beyond the lower frame, the object being to accommodate the rows of springs placed on the end slats of the lower frame. But, whatever the object was, the Jones mattress was capable of use in the same way as Fulton's; only, instead of being suspended on all four sides, it would be suspended at the head and foot only, the lower frame being bolted through uprights to the upper frame, so that the cross slats of the lower frame would sufficiently support the springs without the aid of any slats in the bedstead. There was no necessity for thus suspending a mattress so long as the old wooden bedsteads with deep side boards were in use; but, as soon as the introduction of iron and brass bedsteads made it necessary to sink the lower frame of the mattress below the plane of the bedstead, it certainly needed no more than the mere ordinary skill of the mechanic, with the Jones mattress before him, to support it by hanging it from the ends, or from the sides of the bedstead, or from all four sides at once. That there have been extensive sales of these suspended mattresses is not particularly suggestive. As the sale of brass bedsteads increases, the sale of mattresses adapted for use

with them will naturally increase too. The decree of the circuit court is reversed, with costs, and cause remitted, with instructions to dismiss the bill.