TORREY et al. v. HANCOCK.

(Circuit Court of Appeals, Eighth Circuit. November 26, 1910.)

No. 3,311.

**1. PATENTS (§§ 58, 62*)—ANTICIPATION—BURDEN AND MEASURE OF PROOF TO CARRY BACK DATE OF INVENTION.**

Where an anticipatory device is shown to have been in use prior to the application for a patent, the burden rests upon the patentee to carry the date of his invention back to a time antedating such use by satisfactory and convincing proof, and oral testimony, given many years after the event, unsupported by physical exhibits, and which is in itself somewhat contradictory, is not sufficient.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 75, 78; Dec. Dig. §§ 58, 62.*]

**2. PATENTS (§ 58*)—EVIDENCE AS TO ORIGINALITY AND PRIORITY—PRESUMPTION OF PATENTEE'S KNOWLEDGE OF PRIOR ART.**

A patentee is conclusively presumed to have been entirely familiar with all the prior art as disclosed either by patents or prior devices.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 75; Dec. Dig. § 58.*]

**3. PATENTS (§ 45*)—EVIDENCE OF INVENTION—EXTENSIVE USE.**

General public acceptance and use of a patented device is only a fact to be considered with all the other facts in the case on the issue of patentable novelty, and is most appropriately resorted to where that issue is in grave doubt.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 51–53; Dec. Dig. § 45.*]

**4. PATENTS (§ 327*)—SUITS FOR INFRINGEMENT—PRIOR DECISIONS.**

While the rule of comity, and the desirability of uniformity of decision, must incline a court to follow the decision of another court of coordinate jurisdiction sustaining a patent, such rule is not imperative, and does not apply where there is a substantial difference in the proofs.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 620–625; Dec. Dig. § 327.*]

**5. PATENTS (§ 16*)—INVENTION—CHANGES IN PROPORTION OR DEGREE.**

Changes in degree, proportion, or symmetry in a machine, where it does the same thing in the same way and by substantially the same means, although it may produce better results, does not amount to patentable invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 15; Dec. Dig. § 16.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. PATENTS (§ 328*)—INVENTION—ROTARY DISK PLOWS.

> The Hardy patent, No. 556,972, for a rotary disk plow, which covers a combination of elements, all of which except the inclination out of the vertical plane of the plowing disk were present in prior patented combinations, is void for lack of patentable novelty and invention in view of the fact that such inclination was suggested in prior patents, and that plows had previously been actually adjusted, at first by temporary wedges, and later by a casting supplied by the manufacturer and quite extensively used, to give the disk such inclination.

Appeal from the Circuit Court of the United States for the District of Kansas.

Suit in equity by Nina Little Hancock, Administratrix, against George H. Torrey and others. Decree for complainant (170 Fed. 600), and defendants appeal. Reversed.

See, also, 128 Fed. 424, 63 C. C. A. 166.

This was a suit to restrain infringement of United States patent No. 556,972, issued March 24, 1896, upon the application of Clement A. Hardy, filed July 31, 1895, to his assignee C. A. Keating for alleged new and useful improvements in rotary disk plows. The suit was originally brought by Milton T. Hancock as assignee of the rights of Keating in some designated territory, and was subsequently after his death revived in the name of Nina L. Hancock, his administratrix, the present appellee and complainant. It was originally brought against George Torrey, a user of the alleged infringing device, but subsequently, it is claimed, manufacturers of the device so adopted the defense of the case as to make them parties to the suit and liable for whatever decree might be rendered. That the patent was invalid for want of novelty was the main defense. The trial below resulted in a decree enjoining the defendant user and the manufacturers from further infringement and awarding an accounting for damages and profits.

Thomas A. Banning and H. H. Bliss (John H. Atwood, on the brief), for appellants.

Chester Bradford and Charles C. Linthicum (S. B. Cantey, Houston & Brooks, Sluss & Wall, Offield, Towle & Linthicum, and Bradford & Hood, on the brief), for appellee.

Before HOOK and ADAMS, Circuit Judges, and REED, District Judge.

ADAMS, Circuit Judge. The second claim of the patent in suit is the only one in controversy. It reads as follows:

"In a rotary plow, the combination with a plow-beam, of a box-bearing arranged on the plow-beam, an axle rotatable in the box-bearing, a plowing-disk secured to the said axle, rotated solely by the natural draft thereof and the friction of the soil, set diagonally to the line of draft and inclined out of a vertical plane for cutting the furrow and turning the soil therefrom, a furrow-wheel mounted on an axle at the same side of the plow-beam as the plowing-disk and arranged in advance thereof, an arm pivoted to the rear portion of the plow-beam and provided with a caster-wheel arranged in rear of the plowing-disk, and a stop device for limiting the swinging motion in one direction of the arm carrying the caster-wheel, said furrow-wheel and caster-wheel being inclined for resisting the side pressure of the plowing-disk, substantially as described."

The description of the invention in the specification discloses that, while the claim is for a combination of many elements, the patentable novelty, if any, resides in certain specified means by which the disk of a well-known class of plows, in the operation of plowing works it-

self by suction, and without much weighting, into the ground, thereby cutting a wider furrow and doing more satisfactory work, especially in hard, wet, and sticky ground. The means for accomplishing this result which alone are patentable, are stated in the specification to be a concave disk or disks "arranged diagonally to the line of draft and having an adjustable inclination to the vertical whereby said disk or disks are inclined rearwardly and across the line of draft at such an angle as will effect," etc., and these means are specified broadly in the claim just quoted, as disks "set diagonally to the line of draft and inclined out of the vertical plane." The arangement of the disk diagonally across the line of draft necessarily determines the width of the furrow. The more acute the angle the narrower the furrow; the more obtuse the wider. The nearer the disk crosses the line of draft at right angles so as to cut a wide furrow the greater the resistance and the more it operates like a scraper rather than a plow. From this necessary operation of the elements sprung the desirability of some device to produce a suction of the operating disk into the ground, less scraping, more cutting, and correspondingly wider furrows. If we except the one element of the inclination of the disk out of a vertical plane, the other elements of the second claim of the patent, including the disk itself and its diagonal arrangement across the line of draft, had been combined together in single organized structures, notably the Harcourt and Bartlett plows manufactured and sold by the Hancock Rotary Plow Company of Indianapolis, Ind. Plows of their type had been in practical daily use long before Hardy's invention. Whether the introduction of this excepted element constitutes patentable novelty for the combination as a whole, or, limiting our inquiry to the necessities of the present case, whether Hardy "invented" a "new" machine or a "new" improvement of an old machine, within the meaning of section 4886 of the Revised Statutes (U. S. Comp. St. 1901, p. 3382), is the important and controlling question for decision. In other words, conceding, without admitting, the original patentability of the combination, the question is whether Hardy invented it, or whether he was anticipated in that respect by others. No novel question of law or intricate question of fact is presented. While the record, consisting of patents, patented and unpatented structures, oral testimony of users, manufacturers, dealers, and experts, is voluminous, the controlling question of fact is in a narrow compass and the law applicable to it is not difficult.

It may be admitted that the disk of the Harcourt and Bartlett type of plow stood in a vertical position, but with fairness to the art, and as a possible explanation of the degree of efficiency attained, it should be said that it had a concave anterior side so dished as to form a curvilinear backwardly inclined part for doing the actual cutting into the ground in the process of plowing.

The Goembel patent, No. 453,183, issued June 2, 1891, was for improvements in rotary disk cultivators, in which disks similar to those of the patent in suit were employed, to perform similar service. The specification of that patent contains directions how to position the disk so it "can readily be set at any angle," and so it "when placed in position will have the upper half of its concave face in line with the

standard-bearing, while the lower half will be thrown out as shown in figure 10," thus:

The testimony shows without contradiction that this arrangement would give an inclination on a 24-inch disk of a little over 4½ inches from the vertical.

The Brown patent, No. 496,850, issued May 9, 1893, also discloses means for setting the disks in cultivators at an angle inclining backwardly from the vertical.

The Lane patent, No. 208,246, issued September 24, 1878, for improvements in rotary plows discloses disks with wide rims at all times inclined out of a vertical plane. These disks were unlike those of the Hardy patent in this, that their rims instead of being integral with the body of the disks were connected with the hubs by spokes. These rims were so flared or bent backwardly and upwardly as to have a constant inclination from the vertical plane. They produced the suction and performed the cutting in lieu of the scraping action claimed for the Hardy patent; and although they stood, speaking of them as an entirety, in a vertical plane, their operating part—that which performed the work—had a constant position of considerable inclination away from the vertical.

The Rolph patent, No. 531,566, issued December 25, 1894, for improvement in cultivators, shows disks inclining backwardly from the vertical, and describes their advantages. In his specification, after referring to the different provisions for adjusting the inclination and movement of the disks, Rolph said by reason of the adjustable bearings, the disks "may be given a greater or less diagonal inclination * * * or they may be given more or less of a vertical pitch inward or outward by simply adjusting the bearings upon the sleeves. * * * The difficulty ordinarily experienced in ordinary disk cultivators—that of running them to proper depth in hard ground—is overcome by reason of the adjustable connection between the bearings of the disks, their sleeves and the crank arms of the arch, whereby the disks may be brought more or less directly under the weight of the driver, and given more or less of a forward inclination; that is to say, the lower edge of the disk can be set forward, making a light draft, at the same time insuring the disk traveling to a proper depth even though the ground be very hard. * * * It will be observed that but little weight will be required to maintain them in the ground."

The fourth claim itself in the Rolph patent is for a combination "whereby the vertical pitch inward or outward of the said disks may likewise be varied substantially as shown and described."

This patent seems to have had for its object the accomplishment in a kindred department of the same art, the purposes of Hardy's patent and to have pointed to the advisability of adjusting the disks out of the vertical in order to more effectually accomplish those purposes. Other patents, notably the Richardson, No. 264,763, issued September 19, 1882, and the Garst, No. 273,508, issued March 6, 1883, for three wheeled sulky moldboard plows exhibiting the interchangeability in similar combinations of the disk and moldboard, as the cutting elements

of a plow, were introduced in evidence as a part of the prior art.

So much for patents and patented structures. Attention will now be given to certain unpatented structures disclosed in the prior art.

Hancock, under whose patent and direction the Hancock Rotary Plow Company of Indianapolis had manufactured plows of the Hancock and Bartlett type, in the spring of 1893 took a shipment of these plows to Dallas, Tex., with a view of working up a trade there. He soon became acquainted with C. A. Keating, president of the Keating Implement & Machine Company of Dallas, a concern which was handling plows in that city, whom he sought to interest. He exhibited his plows at the state fair in Dallas in the fall of 1893 and at the suggestion of Keating undertook to demonstrate their efficiency in a river bottom where the ground was rooty and sticky and difficult to work. He there met one Hendon who had been engaged in the implement business generally, and particularly in handling the old moldboard plows. He took an interest in the new kind, or disk plow, handled by Hancock and desired to see it operate. Hancock, unfamiliar with the peculiar ground of Texas, was naturally anxious to get all possible information which would enable him to successfully introduce his plow. These facts brought the two men together, and Hendon was ultimately employed by Hancock to co-operate with him in Texas. Before his employment, however, Hendon inspected the operation of Hancock's plow in the river bottom, and we here reproduce some of his testimony of what then occurred between them. He testified that:

"He [Hancock] told me that he was expecting to make a deal with Mr. Keating here for the plow, and he wanted to get up a nice sample of work on the plow, and asked my opinion about it—what I thought of it. Well, I looked at the plow—was standing astraddle of the disk looking down at it—and I asked him the question if that disk was not doing more pushing than cutting, pressing the dirt out, this being set up straight. Of course I did not measure—take any plumb-bob to see whether it was or not; but it appeared to be about straight up, and I said to him 'if you would loosen up the bolt and wedge your box further I believe it would do better work,' and he remarked it was probably a good suggestion and he would consider it; and there was a lot of old cedar stumps there where we were plowing, and we had turned up some good big roots, and I had a good strong knife and cut a wedge and loosened up the box and put the wedge on the underside. Well, he decided it did a whole lot better work and according to my judgment it did. * * * Well, I saw that the disk as it was going forward on the angle setting up straight, that the bottom of the disk was merely crushing it. Well, I had an idea if it was fixed to cut like a moldboard, with the edge of it running square against the dirt, it would do better; that the disk laying back could cause it to shed the dirt better."

Mr. Keating was a witness on this subject. These questions and answers are found in his testimony:

"Q. Did you ever see any such devices [wedges] used to alter the positions of the disk? A. I have used them myself in experimenting with the plows. Q. And it was then a matter of knowledge amongst you that by means of such devices the positions could be changed was it? A. It was within my knowledge because I have done it in experimenting with the plow in order to do what I wanted to do with it."

Mr. Miller, a farmer, testified to having used two of the Hancock rotary disk plows on his farm prior to January, 1894. The following questions and answers appear in his testimony:

"Q. Turning, now, to the two plows which you say that you had upon your farm in the fall of 1893, tell us what experience you had with the disk in its actions? A. Well, to make them plow properly, and to take the soil properly, we had to wedge them underneath this beam and on the left-hand side. We wedged it on the side and under the bottom. Q. What was the effect of putting the wedges in at the bottom? That gave it—set it out more at the bottom; turned the disk out more."

This and other supplementing testimony in our opinion established these facts: That the wedging process was resorted to for the purpose of producing a backward inclination of the disk; that its desirability was first perceived by Hendon and afterwards acknowledged and approved by Keating and Hancock, and that for sometime thereafter this crude device was successfully resorted to in Texas for the primary purpose of tilting the disk backward with the ultimate object of causing the plows to enter the earth by the suction of the draft and cut a wider furrow. Plows fixed up in this way became known and will hereafter be referred to as the No. 6 plow. This wedging operation had the effect, mechanically speaking, of raising the end of the spindle upon which the disk was mounted and throwing back its upper edge out of the vertical, thus:

But this crude and temporary practice, as might have been expected, soon gave way to the incorporation of the wedges into the box-bearing casting as an integral part of it, thus:

This resulted in a more pronounced and permanent slant or inclination of the spindle upon which the disk was mounted and a corresponding permanent backward dip or inclination to the disk itself. Plows made with this casting and represented by the Aldrich, Scott and Payne plows, physical exhibits of which are in evidence, afterwards became known and will hereafter be referred to as the B–6 plow They were manufactured, sold, and used in actual plowing operation as early as the spring of the year 1894, a year or more before Hardy's application for a patent was filed in the Patent Office. Between that date and the year 1900, their sales in Texas were quite extensive, and thereby their practicability and

utility were demonstrated. The proof, in our opinion, shows that this plow was the natural, obvious, and simple mechanical development and perfection of the temporary and crude wedging operation suggested by Hendon and put into practice by Hancock. Conceding, however, but not admitting, that there had been no discovery of the backwardly inclining disk and its practical utility until the B–6 plow was designed, what is the result?

We think the evidence shows that the merger or incorporation of the wedges of the No. 6 into the box-bearings themselves of the B–6 plow, and the ultimate evolution of the latter into a practical and useful machine, is attributable to Keating and Hancock. They were in the plow business, and especially interested in developing a salable and useful article. They knew of Hendon's suggestion, and had availed themselves of it to their advantage in the manufacture and sale of the No. 6 plow. This might dispense with further consideration of the matter but it can be added that if the B–6 plow was totally disconnected from the No. 6 plow in its origin and development this fact cannot aid the complainant. Hardy, under whom she claims, applied for his patent July 1, 1895, about a year and a quarter after the B–6 plow had been put into use. To avoid the defense that the latter was an anticipation of the invention of the patent, the complainant undertook to carry the Hardy invention back to May or June, 1894, and to connect Hardy with the box of the B–6 plow as its inventor. Without commenting upon the evidence produced for that purpose except to observe that Hardy himself, who was available to the complainant, was not called as a witness on this point, we content ourselves by saying that the proof is too contradictory, vague, and general to satisfy our minds. The burden was on complainant to do so by satisfactory and convincing proof. Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 11 Sup. Ct. 846, 35 L. Ed. 521; Rogers v. Fitch, 27 C. C. A. 23, 81 Fed. 959; Brooks v. Sacks, 26 C. C. A. 456, 81 Fed. 403; Eastern Paper Bag Co. v. Continental Paper Bag Co. (C. C.) 142 Fed. 479; Kraatz v. Tieman (C. C.) 79 Fed. 322 and cases cited. We do not think she succeeded. She did not produce the inventor himself, who was the best witness on the issue. On the contrary, we are asked to believe the oral testimony of witnesses somewhat contradictory in itself, given many years after the event and unsupported by physical exhibits or other substantial or imperishable monument. Such testimony is not sufficient. Cases supra.

It is conceded in argument that the Harcourt and Bartlett plows made conformably to the Hancock patent, No. 506,815, and originally introduced into Texas by Hancock embodied all the elements of the Hardy claim except the arrangement of the disk so as to incline backwardly out of the vertical. This excepted element, we think, had been broadly suggested in the several patents antedating Hardy's invention, not merely as an isolated physical part of a machine, but as an element of a combination substantially like Hardy's second claim and performing practically the same functions as his. It had been crudely realized in the same combination in the No. 6 plow, and

more perfectly realized in the B–6 plow; and all this had occurred before Hardy came upon the field. Whether he knew it in fact or not he is conclusively presumed to have been entirely familiar with all the prior art as disclosed either by patents or prior devices; and the originality of his accomplishment must be determined in the light of this presumption. Voigtmann v. Weis & Ridge Cornice Co., 78 C. C. A. 538, 148 Fed. 848, 851, and cases cited.

Counsel for complainant seek to avoid the effect of the foregoing by claiming that the wedges of the No. 6 plow and their incorporation into the box castings of the B–6 plow were devices to counteract the twisting and warping tendency of the wooden beams of those plows. We, however, are unable to give our approval to this claim. Whatever effect the wedges or the new box-bearing castings had in that direction was, in our opinion, incidental to the main purpose and object of inclining the disk backwardly. But if that was their purpose, Hendon, Hancock, and Keating builded wiser than they knew. They brought about a machine which actually had the inclining disk and performed the work of one. Accordingly, the result achieved is an item of the art prior to Hardy's invention which he is presumed to have known, and if his device is the same thing, or its fair mechanical equivalent, to have borrowed instead of discovered.

It is also claimed that the plow of the patent went into general use and superseded all other devices of its kind, and that this is indicative of patentable novelty. We doubt if this claim is sustained by the proof. Hancock in his testimony admits that the sale of the B–6 plow continued for many years after Hardy's invention. He admits that its sales during that period extended into the thousands, and there is other evidence to the same effect. Whatever be the fact in this particular, however, the rule is that general public acceptance and use of the patented device is only a fact to be considered with all the other facts in the case on the issue of patentable novelty and is most appropriately resorted to in cases where that issue is in grave doubt. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952.

It is also claimed that the angle of inclination of the disk in the No. 6 and B–6 plows was slight in comparison with that of Hardy's second claim; but as Hardy claimed no certain inclination, and as both were intended to serve and did serve the same purpose, the degree of inclination cannot be the subject of invention. Hardy neither claimed nor described any particular angle of inclination of his disks. His expert witness testified that this could be determined by a mechanic skilled in the art of making plows without any difficulty. This taken in connection with the fact that the prior art in the same or similar combinations had shown some inclination of the cutting portion of the disk, or of the disk itself, makes pertinent the observation of Mr. Justice Hunt, speaking for the Supreme Court in Eddy v. Dennis, 95 U. S. 560, 24 L. Ed. 363, a patent case involving the moldboard plow. He said:

"We may add that he [the patentee] does not make claim for invention in using the shovel of this plow in an inclined form. He does not even give the angle of inclination at which it shall be used, whether it shall be 75 de-

grees, like the old plows, or 45 degrees, like this one. Ever since plows have been used—and there is no secular history of man in which the plow and the hoe are not recorded—we may safely believe that there has been an inclination sometimes greater and sometimes less, in the shovel and moldboard. A perfectly upright shovel would be nearly immovable, except in a light soil and to a very slight depth, while one perfectly flat would be of little value. * * * An inclined shovel moldboard, simply and alone, is not spoken of as an invention. It had long been in use in other plows."

It is further argued in support of the decree below that the patent in suit has been sustained by the Circuit Court of Appeals for the Sixth Circuit affirming a decree of the Circuit Court of the district of Tennessee. Our high respect for the learning of those courts gives to their judgment in any case a strong persuasive force and the desirability of uniformity of decisions of courts exercising coordinate jurisdiction in patent cases is so great as to strongly incline us as a matter of comity to acquiesce; but there is no rule of law requiring such acquiescence.

In Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856, it was claimed that the Circuit Court of Appeals of the Seventh Circuit should have followed the decision in a patent case theretofore rendered by the Circuit Court of Appeals of the Eighth Circuit on the same patent. Mr. Justice Brown, speaking for the Supreme Court, said:

"Comity is not a rule of law, but one of practice and convenience and expediency. It is something more than mere courtesy, which implies only deference to the opinion of others, since it has a substantial value in securing uniformity of decision, and discouraging repeated litigation of the same question. But its obligation is not imperative. If it were, the indiscreet action of one court might become a precedent, increasing in weight with each successive adjudication, until the whole country was tied down to an unsound principle. Comity persuades; but it does not command. * * * It demands of no one that he shall abdicate his individual judgment, but only that deference shall be paid to the judgments of other co-ordinate tribunals. Clearly it applies only to questions which have been actually decided, and which arose under the same facts. * * * Comity, however, has no application to questions not considered by the prior court, or, in patent cases, to alleged anticipating devices which were not laid before that court."

The suit in Tennessee was Sanders v. Hancock, reported in 63 C. C. A. 166, 128 Fed. 424. After that case had been disposed of, Hancock, in the year 1904, instituted several other suits in the Circuit Court of the Southern District of California against users of the rotary disk plows claiming that they were infringing the patent which had been upheld in the Tennessee courts, and, on the strength of the final decree in his favor in those courts, moved for preliminary injunctions against the defendants. In passing on these motions Wellborn, District Judge, said:

"Prior adjudication is not necessarily effectual for the purpose indicated, if, on the motion for preliminary injunction, other evidence than that adduced in the prior suit, and seriously challenging the validity of the patent, is submitted. In view of the Aldrich plow and the Lane model, together with the affidavits and other documentary proofs bearing thereon, to say nothing of various other matters now brought forward for the first time, I am of opinion, that the Sanders decree, * * * cannot be accepted as determining the validity of the patent in question for this court, because relevant and proper evidence has been here introduced, which was not there exhibited."

Thereupon the motions for preliminary injunctions were denied, and those suits were not pressed but were dismissed without a hearing on their merits. Then followed the present suit in the Circuit Court for the district of Kansas.

We have already referred to the exhaustive exploitation of the prior art in this case. The proof shows that it contains much, both in the way of patents, physical exhibits and oral testimony, which was not before the courts in Tennessee. Moreover, there is evidence strongly tending to show that that suit was collusive; not designed for a trial of the second claim of the patent upon its merits, but to secure vantage ground for future injunctive relief. In view of these things we are abundantly absolved, in any view of the rule of comity, from following the decision in the Sanders Case.

As we have already seen, the contest, in this case, is limited to the question whether the inclination of the disk away from the vertical plane gives patentability to the combination of the second claim of the patent. In the Tennessee case a wider range was taken and other questions were considered, but it cannot escape observation that the Court of Appeals after referring to a certain patent to one Niles, issued in 1882, for improvements in revolving plows, said:

"It is difficult to distinguish this from Hardy's conception. It is true it is found in a slightly different kind of machine. But they belong to the same family—a very kindred art. We think, therefore, there was no patentable novelty in Hardy's principal idea, that of the peculiar position of his disk. If it had been new, there could be no doubt it would have made his combination new and patentable."

After a patient consideration of the prior art we are brought to the same conclusion. Prior patents in the same and closely related fields had so definitely suggested the backward inclination of disks and physical unpatented structures had so actually employed them in practical and useful devices containing all the elements of the combination of the second claim that Hardy, in our opinion, could not have been the original inventor of that combination. With all these patents and physical structures before him it did not require inventive skill to follow the directions and reproduce the structures, even in his improved form. He got up a more comely and graceful plow. The beam was of iron instead of wood, and as a whole, the plow was less cumbersome and more symmetrical, and probably more salable; but like the B–6 in comparison with the No. 6 plow, it was only a natural mechanical development of pre-existing types. It introduced no new element, and made no essential rearrangement of old elements. Any changes made were in degree, proportion, or symmetry. The plow of his patent did the same thing in the same way, and by substantially the same means as before, and although it produced better results it did not rise to the dignity of invention. Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566; Belding Mfg. Co. v. Corn Planter Co., 152 U. S. 100, 14 Sup. Ct. 492, 38 L. Ed. 370.

This conclusion renders unnecessary any discussion of the much-debated question whether the manufacturers by their appearance and defense of the action against the user subjected themselves to liability. The decree below is reversed, and the cause remanded to the Circuit Court, with directions to dismiss the bill.