## UNITED DRUG CO. v. IRELAND CANDY CO. et al. *

### No. 8943.

Circuit Court of Appeals, Eighth Circuit.

May 21, 1931.

Jesse A. Holton, of Boston, Mass. (Delos G. Haynes, of St. Louis, Mo., on the brief), for appellant.

Chester T. Neal, of Springfield, Mass. (James L. Hopkins, of St. Louis, Mo., on the brief), for appellees.

Before STONE, KENYON, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

Appellant sued the Ireland Candy Company, a Missouri corporation with its principal place of business in St. Louis, for alleged infringement of United States patent No. 1,612,762, issued to one John M. Flynn December 28, 1926, of which said patent appellant is now the owner. The candy company answered, denying infringement, and alleged that it had purchased the mechanisms charged to be covered by the patent in suit from the National Equipment Company, a Massachusetts corporation. The National Equipment Company intervened, and ultimately filed answer, adopting that of the candy company previously filed, and moving that the complaint be dismissed for the reasons therein stated. By way of counterclaim, it charged that appellant had infringed United States patent No. 1,302,205 issued April 29, 1919, to one Antonio Pagliuca, interest acquired by the National Equipment Company on or about January 30, 1918. In its counterclaim the prayer was for an injunction and accounting against appellant. The Ireland Candy Company, as a customer of the National Equipment Company, became a nominal defendant in the case. Upon trial, the court found the issues in favor of the equipment company; decreed that the bill of complaint be dismissed; that claims 1, 3, 10, 12, 14, 15, and 16 of the Pagliuca patent, No. 1,302,205, were valid and infringed; enjoined appellant from further acts of infringment; ordered an accounting for profits and damages; and appointed a master to take and state the account.

Both patents relate to the same type of mechanism. The Pagliuca patent is for a "Chocolate-Coating Machine And The Like"; the Flynn patent in suit relates to "Detailing Mechanism for Candy Coating Machines." As appears from this record, the Pagliuca patent may fairly be called a basic or pioneer patent in the art with which it deals. The nature of the invention is thus described in the specification of letters patent No. 1,302,205:

"The present invention relates to an improvement in machines for coating chocolates or other coating machines in which chocolate or material in a liquid state is applied to the goods and the goods then passed from one

moving part or conveyer to another while the coating upon them is still soft.

"A difficulty encountered in machines of this kind resides in the fact that when the goods pass from one conveyer to another there is a tendency for the coating to be drawn out or pulled away from the rear side or edge of the chocolate adjacent its bottom edge. This leaves a tail, so called, which is disfiguring and which it is desirable to eliminate. The probable reason for the formation of this tail is the tendency of the coating, which is more or less viscous, to cling to the end of the conveyer off which the chocolate is moving and accordingly be drawn out as the chocolate passes onto the next conveyer and is carried forward by it."

The machine to which this patented device is applied is called an "enrober," and the device itself a "detailer." The specification of the Flynn patent, No. 1,612,762, makes the following claims and concessions:

"This invention relates to detailing mechanism for candy coating machines and with regard to certain more specific features thereof to rod detailers arranged between conveyor sheets. The invention has for one of its principal objects to overcome the difficulties encountered in the use of prior constructions of this general character which have for some time been subject to criticism on account of disfiguring the bottom surfaces of the confections, and also on account of inefficient operation which left in many cases an unsightly confection. It is not suggested that the arrangement of a rod between the ends of adjacent feed sheets is new. Enrober machines have been equipped for some years with such a structure as broadly stated. The present invention deals with an improvement on the machines which have been in commercial use, the additional mechanical changes being relatively slight and confined to variations in size of the detailing rod, the speed at which it rotates and the arrangement of the rod with respect to the conveyor sheets and the arrangement of the conveyor sheets with respect to each other. While these modifications in themselves as mechanical differences from the prior art are slight, nevertheless, a most important commercial advantage has followed, and what was formerly regarded as a seriously defective organization now operates with the highest efficiency to produce evenly coated and trimmed confections. * * *

"Between adjacent ends of the feeding mechanisms there is arranged a detailing rod 13 of very small diameter, reduced in the size to about one-third of the diameter of the detailing rods formerly used. * * * The high speed of the rotation given to the very small detailing rod 13 produces a centrifugal action which causes this rod to travel in a circular path, the diameter of which is slightly greater than the diameter of the rod. * * * the detailing rod effectively acts to wipe off the tail of the soft coating which has been deposited on the confection during its passage along the screen 10."

The operation of the enrobing machine is thus satisfactorily described in the brief of appellant: "The issue in this case concerns a small device which is a part of a large candy-coating machine called in the trade an Enrober. Enrobers are characterized by two endless belts, one of which is a wiremesh belt, known as the feed belt, and the other of which is usually a canvas, paper-covered or oilcloth belt, known as the delivery belt. In the operation of enrobers, what are known as centers, which may be of cream, caramel, nuts or various mixtures, are fed onto the wire feed belt at one end and are moved slowly and continuously along by the wire belt through a bath of commercial chocolate. The chocolate bath is kept at a temperature of 88 to 90 degrees Fahrenheit, and is constantly agitated and circulated so as to cover these centers as they pass on the wire belt through the bath. After the centers have been covered by the hard chocolate, it is necessary to deliver them to a cooling room where the chocolate is hardened in position. For this purpose they are delivered from the endless wire belt to the delivery belt and conveyed by the latter to the cooling room where a number of operatives, usually girls, standing at the far end of the delivery belt, take off the coated centers and pack them in suitable boxes or containers. The differences in temperature require two separate endless belts which necessitates a gap of some sort, either small or large, between the two belts. Enrobers have been in operation for a great many years, but the product of same had been distinguishable from high-grade, hand-dipped chocolates by reason of tails of chocolate hardened and extending from the rear lower edges of the pieces. These tails were caused by the soft chocolate coating being drawn out as the coated center left the wire belt and passed over to the delivery belt. There was just enough frictional engagement to pull out a tail of the soft chocolate so that when the confection reached the delivery belt it had an extension from its rear lower edge

which might be anywhere from three-sixteenths of an inch to three-quarters of an inch in length. Because of this, Enrober-made chocolates were distinguishable from what was considered a high-grade confection."

The problem then was to procure a device which would eliminate these disfiguring tails. The operation of the entire mechanism and the relationship of the elements under consideration are shown in the accompanying drawings:

## Flynn Drawings.

## Pagliuca Drawings.

Here, as numbered in Figs. 2 and 4, in the Flynn drawings, 10 represents the feed belt upon which the centers are fed and moved through the chocolate bath; 12 is the delivery belt to which the covered centers are delivered from the feed belt for conveyance to the cooling room; 13 is the detailer, located between the feed and delivery belts, for the purpose of eliminating the extension, or "tail," from the rear lower edge of the covered center as it passes from one belt to the other. In the Pagliuca device the above-named elements are similarly situated. In the drawings 5 to 6 (1) is the feed belt, (2) the delivery belt, and (31) the detailer. The confection is seen passing from left to right until the elimination of the disfiguring "tail" is shown in Fig. 8. Appellant makes a point upon the apparent space between the two belts, and the size of the detailing rod or roll, as shown in the Pagliuca drawings; but there is nothing in the specifications or claims to condition such space and size; drawings are designed to show with clearness the general relationship of the elements, and not with precision the measurements involved, unless such a purpose is specially indicated. The striking similarity of the devices covered by the two patents is disclosed by reference to typical claims of each patent. Claims 12 and 14 of the Pagliuca patent read thus:

"12. In a machine of the type specified, the combination comprising conveyors arranged one forward of the other in continuation thereof with a space separating the adjacent ends of said conveyors, an interposed means presenting a moving surface in the space between the ends of said conveyors, and means whereby said conveyors and interposed means may be operated and the moving surface of said interposed means may have a speed greater than the speed of said conveyors."

"14. In a machine of the type specified, the combination comprising conveyors arranged one forward of the other in continuation thereof with a space separating the adjacent ends of said conveyors, a roll arranged in the space between the ends of said conveyors, means for operating said conveyors, means for operating said roll whereby the surface thereof will have a speed in excess of the running speed of said conveyors, and means for cleaning the surface of said roll."

From the Flynn patent we take claim numbered 1 for comparison: "A mechanism for removing the tails from confections comprising in combination a feeding sheet for coated confections, an extremely small rotating gyratory rod arranged close to the end of said sheet and operated at a high speed with a gyral action, and a second feed sheet having an end arranged close to the said small rod, the aforesaid parts being juxtaposed so as to enable the confection to get its entire support from the feeding means as it passes from one to the other."

It will be observed that the elements employed in each patent are identical. In each there are the two sheets and the detailer occupying the same general position with reference to each other. In the Pagliuca patent the detailing element is called variously "an interposed means presenting a moving surface" and a "roll"; in the Flynn patent the same element is called a "rod." This difference in nomenclature is unimportant. Obviously, the claims of the former patent read with exactness upon the described Flynn structure. The patentee of the latter concedes that the mechanical changes and differences from the prior art are slight, and are "confined to variations in size of the detailing rod, the speed at which it rotates and the arrangement of the rod with respect to the conveyor sheets and the arrangement of the conveyor sheets with respect to each other." As has been pointed out, the general location of these elements with respect to each other is the same in both patents; the reciprocating operation of these elements is identical; and the result the same in kind, if not in excellence. It can scarcely be claimed that slight mechanical modifications of these same elements, such as bringing the sheets a little closer to each other, slightly depressing the surface of the detailing roll or rod, decreasing its size and increasing its speed, as experimentation in operation might dictate, could rise to the plane of novelty and invention, and could operate to remove the later device from the application of the claims of a prior basic patent entitled to a liberal range of equivalents.

The patentee of the Flynn patent depended upon the alleged gyral action of the detailing rod in his application to the Patent Office. It was upon this consideration only that his application was allowed. This gyral action is claimed to be attained by the employment of a small rod operated at a high speed—how "small" and how "high" is not stated in the claims, and to them we must look for ascertainment of the invention. In the specification it is stated that the rod should be very small, reduced in size to

"about one-third of the diameter of the detailing rods formerly used." From the record this description is still indefinite. It is a matter of some dispute whether any such rod will "gyrate," causing it "to travel in a circular path, the diameter of which is slightly greater than the diameter of the rod," unless the rod itself is bent, or its bearings are loose and not perfectly fitted; also whether such a result is useful and desirable. But, however this may be, it is clear that, from the teaching of the Flynn patent, no one skilled in the art could construct and operate its detailing device without experimentation to determine both the size of the rod and the speed at which it must be driven. This court, condemning indefiniteness of this nature in Cleveland Gas Burner, etc., v. American Heater Corporation, 38 F.(2d) 760, 762, said:

"There is no description of this specific structure in the specification, and claim 5 contains no description of the invention adequate to render it useful and to disclose a practical invention. The patent fails to satisfy the requirements of section 4888, Rev. St. (35 USCA § 33), which provides that the application shall contain a written description of the manner and process of making and using the invention 'in such full, clear, concise and exact' terms as to enable any person skilled in the art to make and construct it. Beidler v. United States, 253 U. S. 447, 40 S. Ct. 564, 64 L. Ed. 1006; Stewart v. American Lava Co., 215 U. S. 161, 30 S. Ct. 46, 49, 54 L. Ed. 139.

"As said by the Supreme Court in the case last cited 'the public are told little more than to try experiments until they find a burner that works.'"

"If description of patent is so vague and uncertain that no one can tell, except by independent experiments, how to construct patented device, patent is void, since object of Rev. Stat. § 4888 (Comp. St. § 9432), requires that it apprise the public of what patentee claims as his own, courts of what they are called on to construe, and competing manufacturers and dealers of exactly what they are bound to avoid." Reflectolyte Co. v. Luminous Unit Co. (C. C. A. 8) 20 F.(2d) 607.

But we do not think the modifications claimed are sufficient to differentiate the Flynn from the Pagliuca patent. In the specification of the latter, the following language is found: The detailing roll is driven "preferably at an appreciably faster speed than the conveyers. * * *

"While the roll 31 (the detailer) will operate to eliminate the tails to a certain extent without especial regard to its speed in relation to that of the conveyers, yet the action is materially improved if the roll 31 be rotated faster than the conveyers. * * *

"During the action just described the excess speed of the roll 31 over the conveyers and especially the conveyer 2 will not materially affect the movement of the chocolate or disturb the coating on the bottom of the chocolate, inasmuch as the roll lies below the coated bottom surface of the chocolate which will be resting upon one or the other of the conveyers owing to the narrowness of the space between them within which the roll 31 is contained. * * *

"It will be understood of course that the invention might be applied in other connections than that referred to and that considerable variation from that shown might be employed in the means for practising it."

This teaching respecting the comparative speed of detailer and conveyers is carried forward and repeated in the claims. It is apparent that Flynn merely considered it desirable to increase the speed of the detailing rod over what may have been thought necessary theretofore, and sought to make this action a distinguishing feature of his patent.

Such "slight modifications" as Flynn claims to have made do not constitute invention. He uses the same "elements functioning in the same way and producing the same result, with perhaps difference in degree only." Reflectolyte Co. v. Luminous Unit Co. (C. C. A. 8) 20 F.(2d) 607.

"Changes in degree, proportion, or symmetry in a machine, where it does the same thing in the same way and by substantially the same means, although it may produce better results, does not amount to patentable invention." Torrey et al. v. Hancock (C. C. A. 8) 184 F. 61.

"A close copy which seeks to use the substance of the invention, and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement." Sanitary Refrigerator Co. v. Winters et al., 280 U. S. 30, 50 S. Ct. 9, 13, 74 L. Ed. 147.

Under the rules declared in the foregoing cases, it is our opinion that the Flynn patent, No. 1,612,762, is void for want of

patentable invention and definiteness of description, and that appellant's device infringes the Pagliuca patent, No. 1,302,205, by which it was anticipated. Appellant seeks to avoid this result by the contention that the Pagliuca device was not a commercial success. This contention meets with strong contradiction in the record. But, whatever the truth may be in this regard, the "fact that machines built under patent were crude and imperfect does not militate against validity of patent, where such machines, though crude, were operative, since capacity to operate is one of the acid tests of utility as an element of invention." McDonough v. Johnson-Wentworth Co. (C. C. A. 8) 30 F.(2d) 375.

This principle is thus stated by the Supreme Court in Hildreth v. Mastoras, 257 U. S. 27, 34, 42 S. Ct. 20, 23, 66 L. Ed. 112: "It is not necessary, in order to sustain a generic patent, to show that the device is a commercial success. The machine patented may be imperfect in its operation; but if it embodies the generic principle and works, that is, if it actually and mechanically performs, though only in a crude way, the important function by which it makes the substantial change claimed for it in the art, it is enough. Telephone Cases, 126 U. S. 1, 535, 8 S. Ct. 778, 31 L. Ed. 863; Mergenthaler Linotype Co. v. Press Publishing Co. (C. C.) 57 F. 502, 505."

Counsel for appellant in argument and the patentee in his specification lay great stress upon the "important commercial advantage" which, they claim, has followed this invention, "but such evidence is inconclusive and insufficient, where the changes made from the prior art are mere changes of mechanical construction, or of form, size, or materials." Western Willite Co. v. Trinidad Asphalt Mfg. Co. (C. C. A. 8) 16 F.(2d) 446, 450; Klein v. City of Seattle (C. C. A. 9) 79 F. 200.

It is further urged that the equipment company is estopped because of laches to maintain its counterclaim. Defendant probably learned of this infringement of the Pagliuca patent in September, 1924. It filed suit on its patent in the district of Massachusetts in November, 1928. That suit is still pending. Its amended answer in this case was filed September, 1929. Its action is well within the six-year period fixed by the analogous statute of limitations. In such case the rule is thus stated by this court: "When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the bill or by his answer, that extraordinary circumstances exist which require the application of the doctrine of laches; and, when such a suit is brought after the statutory time has elapsed, the burden is on the complainant to show, by suitable averments in his bill, that it would be inequitable to apply it to his case." Kelley v. Boettcher (C. C. A.) 85 F. loc. cit. 62.

See, also, Columbia Graphophone Co. v. Searchlight Horn Co. (C. C. A. 9) 236 F. 135.

Neither pleadings nor evidence disclose the "extraordinary circumstances" which require the application of the doctrine of laches. The trial court found against appellant upon the additional ground of prior use. Because of the conclusions reached, as herein stated, we find it unnecessary to determine this issue. The decree below is affirmed.