### ADRIAN WIRE FENCE CO. v. UNITED FENCE CO.

(Circuit Court of Appeals, Sixth Circuit. May 4, 1915.)

No. 2530.

1. PATENTS ⊙═328—VALIDITY—TIES FOR WIRE CONSTRUCTION AND DIES FOR MAKING THEM.

Claim 1 of the Williams patent, No. 533,403, for an improvement in ties for wire structures, such as wire fences, and the Tiffany patent, No. 755,-187, for an improvement in dies for forming such ties, *held* void for lack of patentable invention, in view of prior patents.

2. PATENTS ⊙═26—VALIDITY—COMBINATIONS—"INVENTION."

Where the elements of a combination and the result attained by it were old, and the change in the means of attaining such result showed nothing more than mechanical skill, there was no "invention."

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. ⊙═26.

For other definitions, see Words and Phrases, First and Second Series, Invention.

Patentability of combinations of old elements as dependent on results attained, see note to National Tube Co. v. Aiken, 91 C. C. A. 123.]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit by the Adrian Wire Fence Company against the United Fence Company. From a decree for defendant, plaintiff appeals. Affirmed.

Edward Rector, of Chicago, Ill., for appellant.

Walter H. Chamberlin, of Chicago, Ill., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. This was a suit to enjoin alleged infringements of three patents and to recover the usual profits and damages. One of the patents was issued January 29, 1895, to Eugene L. Williams and John S. Williams jointly, and numbered 533,403; later, through mesne assignments, the patent was transferred to the plaintiff; and the invention claimed is for an improvement in "ties for wire structures." The second patent was issued March 22, 1904, to George Sylvester Tiffany, assignor, by mesne assignments, to the plaintiff, and numbered 755,187; the invention is in terms claimed to be an improvement in "dies." The third is alleged to have been issued to George S. Tiffany, assignor to the plaintiff, and numbered 774,210; and counsel for plaintiff dismissed the bill as to this patent, calling it the "Tiffany tie patent." The answer is in effect a denial of invention in or infringement of either of the two patents first mentioned. The court found that the first patent was not infringed, without pass-

⊙═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ing upon its validity, and held that the second patent is invalid. Plaintiff appeals.

[1] 1. *The Williams Patent.* The prominent feature of this device is a wire tie designed to fasten the intersections of cross-wires. According to the claim in issue, one of the wires is bowed to receive the other at the intersecting points; while the specification and drawings show both wires are so bowed at these points. The use of the tie is not limited to any specified wire structure, but is extended generally to "wire structures." The infringement charged in the instant suit, however, concerns wire fencing; and the evidence, for the most part, relates to structures of that kind. The fences, as constructed under authority of plaintiff, consist of horizontal or strand wires and vertical stay wires, and both are oppositely bowed at the intersections and there fastened with this form of tie. The tie is made of a staple. The loop (or bend) of the staple engages the vertical wire horizontally at the upper end of its bow, with the legs passing over and engaging the strand wire at both ends of its bow, and the points turning to and bending in opposite directions partially around the vertical wire at the lower end of its bow. The tie so made is circular in form, having two bearings on one side of the vertical wire and two on the opposite side of the strand wire. The combination described in the specification and illustrated by drawings, is covered by two claims; both claims are in issue under the pleadings, but in the evidence and arguments only the first one is, and it is set out in the margin.[1] The staples used in making the ties and their relation to the cross-wires will be better understood by the drawings:

The defense of previous invention is set up in the answer; and in view of the patents there referred to, it is urged that want of patentable novelty in the Williams patent plainly appears. It is therefore necessary to look into the prior art. Cross-wires with crimps or bows at their intersections appear in a number of patents earlier than the one in suit. For instance, Figs. 2 and 3 of Caldwell's patent upon wire fences (October 25, 1887, No. 372,060), show cross-wires

with intersecting bows, which are the same as those of Figs. 4, 5 and 6 of the patent in suit; this is not apparent in Figs. 4 and 5, but the specification states that the bows of these wires are the same as those in Fig. 6. Both Leggett and Staples, the one in his patent spring bed bottom (August 19, 1890, No. 434,794), and the other in his patent spring support for upholstery (September 20, 1892, No. 482,908), show

---

[1] "The combination in a wire structure, of the crossed wires, one of which is bowed to receive the other, with a tie consisting in a staple engaging with its bend the said bowed wire with its legs crossing the other wire and its points bent around the bowed wire from opposite sides, substantially as described."

cross-wires with intersecting bows. Jones, in his patent on wire fences (November 1, 1887, No. 372,625), displays cross-wires with the strands bowed at the intersections; and Mitchell, in his patent on such fences (April 16, 1889, No. 401,450), illustrates his device by uprights which are bent to fit the strand wires at the points of crossing; while Hayden, in his patent on a wire-fastening device for metallic fence posts (April 20, 1886, No. 340,311), discloses bows in strand wires at his post fastenings.

It hardly need be said that the staples used by Williams differ in no material respect from the ordinary and well known commercial staple. It is true, as the specification states, "the members of the staple are carried out of alignment with each other" (Fig. 2), so that when viewed in side elevation the contour of an inverted V appears (Fig. 3); yet it is urged that one of the advantages of the tie is that the commercial staple may be conveniently used in making it.

Caldwell used a "clasp or staple" to fasten the vertical and horizontal wires at their intersecting points. It is stated in his specification:

"The method of uniting the longitudinal and vertical wires at their intersections [is] by means of a clasp or staple bent around the crimped portion of each wire."

The clasp or staple was used by placing its bend diagonally across the bow of the strand wire and turning its ends in opposite directions around the vertical wire at the extremities of its bow. Thus, virtually the same kind of instruments (staples) were designed in the Caldwell patent and in the Williams patent, to fasten the intersections of the same sort of bowed wires, vertical and horizontal.

The Depew patent upon wire fencing (April 11, 1893, No. 495,029) described a "clip that is normally provided with a re-entrant looped bend and elongated parallel legs" (practically a staple partially adapted for ultimate use), as "a connecting clamp or tie" at the intersections of the cross-wires (Fig. 3). The bend of the clip was placed about the vertical wire immediately above the strand, with the curves of the legs engaging the strand and the ends projecting on both sides of the vertical wire where they were twisted together. And Mitchell used a wire clamp to effect his tie. This clamp was a staple, with the ends of its legs bent into hooks. The bend of the clamp engaged the iron upright, resting on the shoulder at the upper extremity of the bow, and the hooks held the strand wire (Fig. 3). This is called by one of the experts a "suspension" tie, but its form would not seem to prevent clasping the cross-wires firmly.

In Biggs' patent upon pliers for building wire fences (January 2, 1894, No. 511,991), a staple is shown (Fig. 3), with its legs turned about midway of their length at right angles and in parallel lines. The bend of the staple was placed about the vertical wire, resting on the strand, and its projecting ends were turned around the strand (Fig. 2).

[2] In the light of the earlier patents, and all of them have not been mentioned, we are of opinion that the Williams device is lacking in patentable invention. The elements of the combination and the result attained by it were old; and upon comparison of the means of at

tainment here with the old methods, we find no change indicating anything more than mechanical skill. The most that can be said of the means now in issue is that the staple is disposed about the intersection of the cross-wires in a manner differing in some respects from that shown by the earlier patents. It is remarkable that the basic contrivance used for making these various ties, and all for the same object, should have been the staple. True, a number of the earlier patents show the staple partially changed into the final form desired (though without destroying its identity as a staple), while Williams displays the staple in its primary as well as its changed form; and still in the Williams tie the teaching of the prior art is none the less apparent. In view, then, of the purpose common to all these patents, it cannot signify how the patentees placed the staples about the cross-wires at their junctions, whether, for example, in the manner shown by Caldwell or Depew, or by Williams; for such differences could only vary the application of the tying device or possibly add to the efficiency of the intersection. It results that the combination in issue was at best simply an extension of the original idea, a change in form, an improvement in degree; in short, an old production wrought in an old way—since it was without material change in means. This is not invention. It is but another instance calling for the application of the principle reannounced by Mr. Justice Shiras in Market Street Railway Co. v. Rowley, 155 U. S. 621, 629, 15 Sup. Ct. 224, 228 (39 L. Ed. 284).

"The case is obviously within the principle, so often declared, that a mere carrying forward of the original thought, a change only in form, proportions, or degree, doing the same thing in the same way, by substantially the same means, with better results, is not such an invention as will sustain a patent. Roberts v. Ryer, 91 U. S. 150 [23 L. Ed. 267]; Belden Manufacturing Co. v. Challenge Corn Planter Co., 152 U. S. 100 [14 Sup. Ct. 492, 38 L. Ed. 370]."

See Smith v. Nichols, 21 Wall. 112, 118, 22 L. Ed. 566; Burt v. Evory, 133 U. S. 349, 358, 10 Sup. Ct. 394, 33 L. Ed. 647; Grant v. Walter, 148 U. S. 547, 553, 13 Sup. Ct. 699, 37 L. Ed. 552; Galvin v. City of Grand Rapids, 115 Fed. 511, 517, 53 C. C. A. 165 (C. C. A. 6th Cir.); Soehner v. Favorite Stove & Range Co., 84 Fed. 182, 187, 28 C. C. A. 317 (C. C. A. 6th Cir.); Torrey v. Hancock, 184 Fed. 61, 70, 107 C. C. A. 79 (C. C. A. 8th Cir.); and see Lane v. Welds, 99 Fed. 286, 290, 291, 39 C. C. A. 528 (C. C. A. 6th Cir.); Brown Hoisting & Conveying Mach. Co. v. King Bridge Co., 107 Fed. 498, 504, 46 C. C. A. 432 (C. C. A. 6th Cir.).

2. *The Tiffany Patent.* It is stated in the specification:

"This invention relates to dies into which may be driven a staple and which will form said staple in the shape of a knot or tie upon crossed wires passing through the dies to unite said crossed wires, as in the making of wire fencing."

The specification further states:

"The object of the invention is to provide simple and efficient means for forming the tie into a peculiar shape upon the crossed wires within the dies. * * * *"

Doubtless the tie so provided for is the one as to which the bill was dismissed; it corresponds in the main with the Williams tie. The two ties are, however, differently applied to the cross-wires. According

to the Tiffany patent, and the testimony of plaintiff's expert, the loop and the ends of the staple engage the strand wire, while in the Williams tie, as we have seen, these parts of the staple engage the vertical wire. Still it is fairly to be inferred from the evidence and arguments, though it is not distinctly stated, that the Williams tie can be produced upon the Tiffany dies; yet, as counsel suggest, the patentable quality of the dies is to be tested regardless of the Williams tie. The dies will be more readily understood through inspection of the drawings, in connection with the claims and interpolations therein of the reference numerals of the drawings, as one of the experts has shown. The drawings are as follows:

The claims, with the interpolations mentioned, appear in the margin.[2] Here again the defenses made include the one of previous inven-

---

[2] "1. Dies having transverse registering channels [3, 8 and 4, 9] for the reception of the cross-wires [12, 14], one of said dies [1] having an inclined way [2] and a semicircular recess [5], the other of said dies [6] having a central concavity [7] with curved branches [11] leading from opposite sides thereof, which curved branches register with the opposite terminals of said semicircular recess [5].

"2. The combination of the dies, one die [1] having an inclined way [2] and a transverse channel [3] below the plane of the highest point of said way, a semicircular recess [5] whose terminals abut upon said channel [3], the other of said dies [6] having a central concavity [7] crossed by a transverse channel [8], said central concavity having curved branches [11] which register with the terminals of the semicircular recess [5] in the first-mentioned die, and a registering channel in the face of each die at right angles to the first-mentioned channel [the channel 4 in the case of die 1 and the channel 9 in the case of die 6].

"3. In a device for the purpose set forth, the combination of the opposed dies having registering channels [3, 8 and 4, 9] in their inner faces which cross at right angles, one of said dies [6] having concave branches [11] which cross one of the channels [8] below the plane of the bottom thereof, the other of said dies [1] having a semicircular recess [5] which registers with the terminals of said branches [11] to direct the ends [13] of the tying-staple past each other and under one of the crossed wires [14].

"4. The combination of the opposed dies having registering cross-channels [3, 8 and 4, 9] in the meeting faces thereof, a semicircular recess [5] in one of said dies [1] crossed by one of said channels [4] and depressed below the plane of the bottom thereof, the opposite die [6] having a depression [7] and concaved branches [11] crossing one of the channels [8] therein, said concaved branches being adapted to lead the ends [13] of the staple into the opposite terminal of said semicircular recess in the opposing die to direct said ends [13] past each other and cause them to lie concentric in the same plane."

tion, and several earlier patents describing dies kindred to those now in issue are referred to. Defendant's counsel insist, moreover, that dies are made simply to reproduce a previously designed object and cannot involve invention for that reason. The contention in effect is that the shaping of depressions, such as channels, recesses, or the like in the faces of dies, is predetermined, and so calls for imitation, and not invention. In view of the prior art, this is a broader proposition than we are required to consider. Williams intended his tie to be made through the medium of a suitable die, though apparently he did not regard the die as a device also calling for the exercise of the faculty of invention. His specification states that the vertical and strand wires are to be tied together as shown in Figs. 5 and 6, and proceeds:

"The staple is then manipulated through the medium of a suitable die in a manner to carry its ends in direction of one another, so that they will curve over the vertical wire * * * at a point below the horizontal wire." [3]

Any consideration of the claims and drawings of the Tiffany patent will show that whatever improvement was made by Tiffany is to be found in the peculiar shaping of the channels and recesses of the opposed faces of the dies. When the staple is forced between the dies, it will obviously follow the lines of least resistance, and so be bent around the intersection of the two cross-wires there held, and converted into a tie like that of Fig. 3 of the drawings.

Nearly four years before the date of the Tiffany patent, the Lamb Wire Fence Company, assignee of Lamb and Hoxie, was granted a patent (April 3, 1900, No. 646,497) disclosing two die constructions, both of which are in principle similar to the die construction in issue and one of which produces a tie like that of Tiffany. The Lamb and Hoxie ties are shown in Figs. 14 and 24:

The faces of both sets of dies show transverse registering channels for the cross-wires. The first set is provided with spirally located and registering grooves deeper than the transverse channels and crossing them diagonally; also with registering recesses for the admission of a plunger with a shoulder and continuing reduced width for receiving  and driving a straight tie wire. The plunger forces the tie wire between the dies in the plane of the cross-wires and into the spiral grooves about the intersection of the cross-wires, producing the result seen in Fig. 14. The only difference that need be mentioned between the first set and the second set of these dies concerns the tie-forming grooves of the dies; the second set being provided with arcs or circular grooves,

[3] Attention may here be directed to the device subsequently designed by John S. Williams and patented, called "wire crimping and fastening pliers," which is used for making the Williams tie in the field during fence construction. The patent bears date February 2, 1897, and the device has recesses and curves for holding the cross-wires and forming the staple into a tie about the intersection analogous to those of the Tiffany dies.

instead of the spiral grooves of the first set, and the plunger forces the tie wire in the same plane as it does in the other but through the circular grooves and about the cross-wires with the result shown in Fig. 24. It need not be said that, when the sections of these two sets of dies are placed face to face, the respective tie-forming grooves are so shaped as to constitute continuous channels for the guidance of the tie wires and the formation of the knots or ties desired. It is true that a straight tie wire is employed in both sets of these dies, while a staple (a U-shaped wire) is used in the Tiffany dies. The Lamb and Hoxie tie wire is driven into the grooves provided for its reception and guidance, with only one end forward, and the Tiffany staple is driven into its grooves with both ends forward. Can it be that this difference introduced by Tiffany amounts to invention? The answer will not be found in a consideration of the *form* of his tie; for that was old and is not part of his claims. It must be found, as already stated, in what was done through the introduction of channels, grooves and recesses, into the faces of the dies; and since the methods adopted and the results achieved are practically the same in both devices, it is hard to see why Tiffany did more than to introduce a mechanical equivalent.

But, in addition to the teaching of the Lamb and Hoxie patent, Tiffany was previously advised of the fact that dies might be made for the introduction of a staple and its formation into a tie. Hoxie had accomplished this in 1901 (letters patent No. 678,955). The face of one section of his dies contains transverse channels for the reception of the cross-wires, and also recesses for forming a tie similar to the letter S. The other die member is provided with a slot through which the tie wire (the staple) is driven at right angles to the meeting faces of the dies and into the tie-forming recesses of the other die. And as early as 1899 Lamb provided a die for joining intersecting wires (letters patent No. 628,986) by carrying cross-wires through transverse channels in the faces of the dies and driving two staples through slots into the tie-forming recesses and so converting them into a double spiral tie about the intersection. Plungers were used for driving the staples, and like the plunger of the Hoxie patent, were worked transversely to the faces of the dies. Lamb's dies and his method of operation are so plainly described in his specification, that we reproduce a portion in the margin.[4]

It is contended that the Hoxie patent and the Lamb patent should be disregarded because the staples were driven into the dies at right

---

[4] "The improvement consists in coacting dies having feed slots for the staple-like fasteners, arranged diagonally across the lines of the wire-receiving channels, the latter being provided in the working faces of the dies to have the deep wire channel of one die cross the corresponding channel of the other die at right angles in order to properly position the wires in relation to each other and to the feed slots for the staple-like fasteners and each die having semi-spiral grooves which extend in the general direction of the deep wire-receiving channel thereof, whereby the locking fasteners may be fed simultaneously through the diagonal slots of both dies to be positioned thereby in oppositely inclined directions across the joint between the crossed wires, and the semi-spiral groove of one die operates on the closing of the dies to twist the ends of the staple-like fastener fed by the other die around the wire which is contained in the said die that effects the twisting of the staple fastener."

angles to the plane of the cross-wires, and that it is essential to the Tiffany dies that they should be separated from each other in the plane of the cross-wires to which the tie is to be applied by the dies. This ignores the fact that the purpose in all these dies was to fasten the cross-wires at their intersection; it ignores the fact that grooves and recesses were worked into the faces of the dies, with differences alone in shape and depth according to the form of the desired tie; and so would differentiate the dies simply by the direction the staple was given in its approach to the tie-forming grooves and recesses. It is common knowledge that dies in one form or other are old devices, and that their differences are worked out through changes made in their faces rather than in their operation. The means of introducing the material intended to be given shape and form by the use of dies, would seem to be of little importance. Tiffany does not describe the means to be employed for driving the staple into his dies, and so leaves this feature open to the inference that efficient means were well known. Indeed, when substance and not simply form is considered, there is such practical resemblance in methods of construction and operation between the essential features of the earlier dies and those of the dies in question as to show only mechanical equivalency in the latter; and it is vain to say that the variations, some of them exceedingly slight, in the forms of the ties produced, indicate the presence in the dies themselves of anything beyond the skill of the die mechanic. Thus the elements of the Tiffany combination, like those of the Williams combination, and the result attained by the one, as well as the other, were in every material sense old; and when the Tiffany device is subjected to the tests of the prior art in die construction and uses, it becomes plain that the Tiffany patent in point of validity must be controlled by the principles of law we have applied to the Williams patent.

Furthermore, in view of the state of the prior art touching the feasibility of bending and uniting pieces of wire into particular forms by driving them through pre-designed opposing channels and recesses wrought in the faces of an upper and a lower die, the Tiffany patent cannot escape application of the principles declared in Peters v. Active Mfg. Co., 130 U. S. 626, 628, 629, 9 Sup. Ct. 389, 32 L. Ed. 738. See also, Mahon v. M'Guire Mfg. Co. (C. C.) 51 Fed. 681, 683, per Judge Blodgett; Dayton Loop & Crupper Co. v. Ruhl (C. C.) 55 Fed. 649, 651, per Judge Taft. There is at least strong analogy between the use of dies for welding and forming pieces of iron into particular shape (as, for instance, in Peters v. Active Mfg. Co.), and for forcing pieces of wire into special relations and forms such as are described in the earlier art here disclosed. Nor can the decisions just cited be avoided upon the theory that the Tiffany dies "are in the nature of machines, or active mechanical devices, which co-operate" to form the wire into the tie produced by them; or upon the idea that the tie is applied and combined with the cross-wires of the fence structure. The bows of the cross-wires were shown as distinctly by the Hoxie patent of 1901 as they were by the Tiffany patent of 1904, and enough has already been said of the other co-operating features of the earlier dies. The argument in this behalf of the learned counsel seems to proceed upon

the basis that Tiffany produced something new instead of something old, and (in the sense of invention rather than mechanical skill) by some new instead of an old way. It might well be conceded that if the Tiffany dies were new in these respects they would possess patentable qualities; but we think upon the facts the hypothesis is not sustainable. It follows that the presumption of validity attending the grant of the patent, which is so much relied on here, is not availing.

We conclude that the first claim, the only one really in issue, of the Williams patent, and all the claims of the Tiffany patent, are void. The decree must therefore be affirmed, with costs.

