STAR HAME MFG. CO. v. UNITED STATES HAME CO.

JULIUS J. BANTLIN CO. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. November 12, 1915.)

Nos. 2778, 2783.

1. PATENTS ⊜⟶328—INVENTION—HAME AND TRACE CONNECTOR.
    The Wiedrich patent, No. 721,987, for a hame and trace connector, covers a combination, each element of which, or its mechanical equivalent, is found in the prior art, where it performed the same function, and is void for lack of invention.

2. PATENTS ⊜⟶26—INVENTION—IMPROVEMENT IN FORM OR DEGREE.
    A combination device, which is but a mere carrying forward of the original thought, a change in form, or an improvement in degree, without substantial change in either means or result, does not show invention.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. ⊜⟶26.]

3. PATENTS ⊜⟶36—EVIDENCE OF INVENTION—COMMERCIAL SUCCESS.
    Commercial success is not of importance, where the device is clearly lacking in invention.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 40; Dec. Dig. ⊜⟶36.
    Utility, extent of use, and commercial success as evidence of invention, see note to Doig v. Morgan Mach. Co., 59 C. C. A. 620.]

Appeals from the District Court of the United States for the Southern District of Ohio; Howard C. Hollister, Judge.

---

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suits in equity by the United States Hame Company against the Star Hame Manufacturing Company and against the Julius J. Bantlin Company, respectively. Decrees for complainant, and defendants appeal. Reversed.

L. M. Hosea, of Cincinnati, Ohio, for appellant Star Hame Mfg. Co.

T. Hart Anderson, of New York City, for appellant Julius J. Bantlin Co.

W. F. Murray, of Cincinnati, Ohio, and H. P. Denison, of Syracuse, N. Y., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. The appeals in these cases are from decrees entered in two infringement suits which were based upon the same patent. The decree in the first suit was made upon final hearing, with pleadings and proofs, sustaining the validity of the patent, and awarding a perpetual injunction and an accounting;[1] and in the second suit the decree was purely interlocutory, granting a preliminary injunction upon pleadings and affidavits. While the appeals were heard in immediate succession, they were to all intents and purposes submitted at the same time, and so may be considered and determined in this opinion.

The patent in suit No. 721,987, was applied for by Charles L. Wiedrich April 14, 1902, and was issued to him, as assignor to the United States Hame Company, March 3, 1903. The invention claimed relates to a hame and trace connector. The bill and answer in the first case are in the usual forms of patent infringement pleadings, except that the answer sets out certain alleged facts (additional to references to prior patents and publications) for the avowed purpose of showing invalidity of the patent in suit; and the pleadings of the other case are also of the ordinary forms, except that the bill contains a list of prior patents, which are alleged to have been offered in evidence in the first case, and also some specific allegations to explain the nature and degree of the infringement charged, while the answer alleges that the hames sold by the defendant in that case were made according to a prior patent, which is alleged to be infringed by the patent in suit. Thus the validity of the patent in suit is challenged by the pleadings in both suits, though in the brief upon the appeal from the interlocutory decree contention is made simply against infringement.

[1] The issues of validity so made present the question which we regard as decisive of both cases: Does the patent in suit disclose any quality of invention as distinguished from mechanical skill? The devices claimed to be infringements in the two cases differ in some respects, and accordingly the evidence offered in relation to them also differs; but in substance and effect the rest of the evidence is the

---

[1] This is called a "final decree" in the record; but as to the purposes for which such a decree may be so treated, see Smith v. Farbenfabriken of Elberfeld Co., 197 Fed. 894, 895, 117 C. C. A. 133 (C. C. A. 6th Cir.), approved in Lovell-McConnell Co. v. Auto Supply Co., 235 U. S. 383, 387, 388, 35 Sup. Ct. 132, 59 L. Ed. 282.

same. The patented device will be more readily understood through the drawings used by the patentee to illustrate his specification. They are as follows:

According to the specification, Fig. 1, *A,* is a front elevation of part of a hame, "showing a connector embodying the invention," Fig. 2, a longitudinal sectional elevation with the trace loop *B* removed, Fig. 3 a transverse section on line *3 3,* Fig. 2, and Fig. 4 a like section on line *4 4,* Fig. 1. The specification states that the hame "may be of any usual or preferred form and made of any suitable material." An elongated staple is attached to the hame; and its bar *D* is shown lengthwise by Fig. 1, also with its legs *f* extending through the hame by Fig. 2. A web *E* is formed integrally with the staple bar *D* and inclines from it laterally to the hame, where it is fastened as a brace to the staple bar. The web has a series of openings *e* next to the bar, through which the hooks *b* of the trace loop are inserted so as to engage the bar. These openings are so spaced as to register with the

hooks, and thus the trace loop may be connected with the staple bar at any point desired. An elongated spring plate $H$ is disposed longitudinally between the hame and the staple web, with its outer edge fastened to the hame under the outer edge of the web and with its inner edge free and standing normally parallel with and at such a distance from the staple web as to engage the hooks of the trace loop, and by reason of its resiliency presses the trace loop against the staple bar so as to avoid rattling and accidental disengagement. The spring plate is opposite to the openings $e$ of the staple web, and so is said to exert a firm and equal pressure upon the trace loop, regardless of the openings in which the hooks of the loop may be placed. The object of the device, as the specification declares, is to furnish ready means of so adjusting the trace loop as to bring the draft to bear properly upon the particular animal used.

Theoretically, especially at first blush, it would be difficult to state a good reason why such a device as this does not involve merit and, moreover, invention; yet it appears that not a single hame device has ever been made according to this patent, unless we take into account devices embodying other features, but having springs and bars which are said to make them infringements through the rule of equivalents, and, further, the patent does not stand the test of the prior art. Every element of the combination is old in both substance and function. The spring plate, however, is an apparent improvement upon its predecessors, though only in degree.

1. *The Elongated Staple and Its Trace Connector.* Concededly the object of the elongated staple is to afford means of effective draft adjustment. In a period of something over 36 years before the date of the patent in suit, as many as 11 patents had been issued covering devices designed to accomplish this result, and each included an elongated staple or its obvious equivalent. True, the means of adjustment at different points along the bar of the staple varied more or less; but these variations involved simply differences in forms and names, not in substance or function. The patents alluded to are cited in the margin.[2] The parts employed to connect the staple and trace were differently named. The trace connector of the patent in suit, as we have seen, is called a "trace loop," $B$; the identical form of this trace loop appeared in the Knisley patent more than 10 years before, and was there called a "hook," $D$. Devices with hooks to engage the staple, though differing in their trace-receiving portions, appear in the Dodson "hook," the Wycough "hasp hook," and the Swigert "hame hook," as they are called in the respective patents; and while the corresponding parts found in the Kaffer patent and the other patents

[2] The earliest patent upon this subject to which our attention has been called is No. 53,830, to Kaffer, in 1866, which shows an elongated staple in the hame with three positions for adjustment of the draft upon the animal. See, further, patent No. 254,552, to Eugill, in 1882; patent No. 297,958, to Wycough, in 1884; patent No. 332,861, to Alexander, in 1885; patent No. 374,657, to Church, in 1887; patent No. 386,615, to Stearns, in 1888; patent No. 470,839, to Knisley, in 1892; patent No. 565,501, to Perry, in 1896; patent No. 640,047, to Swigert, in 1899; patent No. 632,551, to Dodson, in 1899; design patent No. 30,730, for term of 14 years, to Surghnor, in 1899.

cited seem to encircle the staple bar without means of release, still they are manifest equivalents of the trace loop in suit.

There are two of the earlier hame attachments that ought to receive special attention. One is the Knisley device, already mentioned, and the other the design patent to Surghnor, before cited. Knisley's is a metal plate fastened to and suitably disposed lengthwise of the hame, having a portion of one side of the plate raised or struck up and the rest formed into a flange. The ends of the flange and its side are rigidly bolted to the hame. The raised portion of the plate is provided with a line of perforations to receive and afford means of changing the position of the trace loop, which, of course, must result in adjustment of the draft. Surghnor's design has a central ridge with two sides receding laterally to the base of the attachment, and so forming a triangular device with its base fastened lengthwise of the hame; in each of these receding sides is a series of holes which are in line with each other and immediately under the ridge. These two series of holes register in pairs with the hooks of the trace loop, and thus plainly afford means of adjusting the draft through changes in position of the hooks and their engagement with different parts of the ridge. While neither of these devices embraces a spring, as the device in suit does, yet in all three of them mechanical equivalence is quite apparent in every other respect; and of this and of the matter of introducing a spring we shall have something further to say.

2. *The Elongated Spring Plate.* Admittedly the main purpose of the present spring is to prevent accidental displacement or disengagement of the trace hooks. In the patents cited, we find provisions for a number of springs which vary in form and are differently disposed, but which were each designed for a purpose substantially the same as that of the spring in issue. For instance, the old Kaffer patent provides for a flat spring, which is held in place by passing the staple legs through elongated openings in the spring near its ends, and thence into the hame; and the spring is curved outwardly, with its outer surface engaging the inner projections of the staple, which separate the recesses designed for adjustment of the trace connector. The spring of the Dodson patent is mounted with one end fastened to the shank of the upper staple leg and with the free end extending so as to bear against the rear of one or the other of the hooks, in order to prevent the trace connector from being accidentally displaced from either its upper or lower adjustment, or from becoming disengaged from the staple in handling the hame when not in use. In the Stearns patent a bar, having a hole near each of its ends, is mounted on the legs of the staple and held in place by spiral springs, which bear against the hame and force the bar outwardly and into close proximity with the staple recesses, in which the trace tug is placed and changed to adjust the draft. The spring tension bar thus engages the trace tug with equal pressure in whatever recess it may be placed, and at the same time admits of readjustment and prevents accidental displacement of the trace tug. This patent antedates the patent in suit upwards of 14 years, and the feature of similarity between the pressure exerted by

the spring tension bar of the former against its trace tug, and that exerted by the spring plate of the latter against its trace loop, cannot escape observation. It is not necessary to pursue this subject.

3. *Necessary Effect of All These Facts upon the Patent in Suit.* Any interpretation of the prior art will be materially aided by keeping in mind one or two of its most prominent facts. One is that the earlier patents and the patent in suit belong to the same art, and thus the teachings of any other art, whether analogous or not, are unimportant. Another is not simply that at the date of the patent in suit all the parts embraced in its claims were old, but, above all, that each part had theretofore substantially accomplished the very purpose for which the use of the part was designed here. The accuracy of these observations may be seen in a simple grouping of the parts and in comparing them with the references and descriptions already given. The claims of the patent embrace an ordinary hame, an elongated staple with a web, an elongated spring plate, and a trace connector. It cannot be necessary to add anything to what has already been said of these parts, except as to two of them. The first is the particular portion of the elongated bar which the patent calls a web, $E$. This web finds close analogy in the flange of the Knisley patent. True, the longitudinal portion of the flange is fastened upon the side of the hame opposite to that on which the web is attached; but the bolted ends of the Knisley flange, when considered in connection with the raised portion of the plate, fairly correspond with the elongated staple of the patent in suit, and the rest of the flange, in its relation alike to the hame and the raised portion of the plate and also the trace loop of the Knisley patent, responds substantially to every purpose claimed for the web of the patent in suit. Indeed, it is quite plain that, if the spring of the patent in suit were disposed in the Knisley device as it is in the former, it would operate in the same way and still more clearly disclose the fact that the web in question is the equivalent of this flange. It should be said that while some of the experts refer to the Knisley patent, they do not speak of this flange in connection with the web in question; yet in rejecting the original claims contained in the application made under the patent in suit the examiner referred to the Knisley device, stating, we think rightly, that it showed "practically applicant's device, lacking the spring." Further, the Surghnor design patent clearly anticipates the web in question. Description of this design has already been given. The experts treat the "receding sides" of Surghnor's design as a *double web;* moreover, the United States Hame Company has ever since its organization exclusively employed this design as part of its hame device, and it is fairly to be inferred that there must have been some good reason for such a course. One of the witnesses states that the plaintiff below so used the Surghnor design under a license. That patent, however, is not in suit, and, as we have seen, has expired.

The remaining part deserving of some further attention is the spring plate of the patent in suit. There is no material difference between this spring and the other springs before commented on, unless such a difference can be found in method of attachment. We have pointed out

227 F.—56

that the fastening of this spring is near its outer longitudinal edge. We have seen that the Kaffer and Stearns springs are each fastened at both ends, and the Dodson spring at only one end. The object sought to be attained, and the mode of applying pressure necessary to that end, through the use of these springs, including the one in issue, are substantially the same. This plainly appears through mere comparison of the new spring with that of either Stearns or Kaffer. It will also be seen that the practical operation of the Dodson spring is substantially like that of the spring in question, if the latter be for the moment treated as though it were cut transversely into as many sections as there are openings in the web, and each of the sections were disposed and operated separately as the patent provides in respect of the spring as a unit; for, upon this hypothesis, it would not be claimed that the sectional springs were not the equivalent of the Dodson spring, any more than it would be that such sectional springs were not the equivalent of the spring in question. Apart from this, however, so far as these springs and their objects and mode of operation are concerned, there cannot, within the well-settled meaning of the patent law, be any difference between a spring attached at either or both of its ends and a spring attached at one of its sides.

We are therefore not impressed with the contention of counsel for plaintiff that the spring in controversy is to be differentiated from the old springs because of its "transverse elasticity." The quality thus ascribed to the spring is an ingenious conception of counsel, since it is not mentioned in the patent; but, assuming the existence of such a quality in that spring, further trouble lies in the difficulty to see any difference in function or operative effect between a spring having transverse, and one having longitudinal, elasticity. It hardly is conceivable, for instance, that the trace hook could be held in place any more effectively by this spring than it could by the Stearns spring. The complete answer to the contention of counsel is, however, that upon any theory the only appreciable difference between the springs of the old art and the spring in question is simply one of extension of the original idea.

In view, then, of the prior art, what room remained for the exercise of the faculty of invention, or for discovery, in producing the patent in suit? Effective distinction between invention and mechanical skill cannot be laid down by general rule. Every case in this respect must be determined according to its special facts. In the present instance, according to plaintiff's testimony, the staple device which the plaintiff actually made and sold, especially the spring,

" * * * was got up chiefly for the Southern trade, where people are careless, and planters do not keep sets of harness for every size of animal; * * * that in the South mostly chain traces are used, and with an ordinary hook, if the load slackened, it would fall out of the eye of an ordinary link; so this was got up to keep the chain in there and to hook it in. In the South drivers are mostly the cheaper grade of labor, shiftless and careless."

Certainly an instance more fit than this for the application alone of mechanical skill could not often arise. Both the fault and the remedy were known. Devices in the old art had been used for the very pur-

poses declared in the patent in suit, and so the skill of the mechanic was even more available than it was in Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. at page 493, 20 Sup. Ct. 712, 44 L. Ed. 856, where it was said of the patentee:

"All he did was to apply it [the device] to a new purpose in a machine where it had not before been used for that purpose."

See, also, Western Electric Co. v. La Rue, 139 U. S. 601, 606, 11 Sup. Ct. 670, 35 L. Ed. 294.

[2] If the prior art showed anything, it clearly disclosed appropriate means to adjust the draft and, through the use of springs, to prevent disengagement of the trace hook. The most, then, that can rightfully be said of the combinations stated in the claims in suit is that they are but a mere carrying forward of the original thought, a change in form, an improvement in degree, without substantial change in either means or result. This was not enough; it was not invention. Market Street Railway Co. v. Rowley, 155 U. S. 621, 629, 15 Sup. Ct. 224, 39 L. Ed. 284; Burt v. Evory, 133 U. S. 349, 358, 10 Sup. Ct. 394, 33 L. Ed. 647; Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. S. 485, 493, 20 Sup. Ct. 708, 44 L. Ed. 856; Grant v. Walter, 148 U. S. 547, 553, 13 Sup. Ct. 699, 37 L. Ed. 552; Belding Mfg. Co. v. Corn Planter Co., 152 U. S. 100, 107, 14 Sup. Ct. 492, 38 L. Ed. 370; Knapp v. Morss, 150 U. S. 221, 227, 14 Sup. Ct. 81, 37 L. Ed. 1059; Galvin v. City of Grand Rapids, 115 Fed. 511, 517, 53 C. C. A. 165 (C. C. A. 6th Cir.); American Carriage Co. v. Wyeth, 139 Fed. 389, 391, 392, 71 C. C. A. 485 (C. C. A. 6th Cir.); Torrey v. Hancock, 184 Fed. 61, 70, 107 C. C. A. 79 (C. C. A. 8th Cir.); Sloan Filter Co. v. Portland Gold & Min. Co., 139 Fed. 23, 26, 71 C. C. A. 460 (C. C. A. 8th Cir.); P. P. Mast & Co. v. Rude Bros. Mfg. Co., 53 Fed. 120, 124, 3 C. C. A. 477: Adrian Wire Fence Co. v. United Fence Co., 223 Fed. 342, 345, —— C. C. A. —— and citations (C. C. A. 6th Cir.).

[3] In reaching this conclusion we are not unmindful of the insistence that the favor with which plaintiff's hame device was received in the market tends to show invention. While such favor is in some instances helpful and persuasive, it never is where the device is clearly lacking in the attribute of invention (Autosales Gum & Chocolate Co. v. Caille Bros. Co., 224 Fed. 473, 476, —— C. C. A. —— (C. C. A. 6th Cir.); and further, as we have seen, the device of the present plaintiff included the Surghnor patented improvement, as well as the supposed equivalent of the spring which the patent in suit added to Surghnor, and hence the sales shown have slight relevancy to the question of invention. It follows that the claims of the patent in suit are invalid and void.

The decree must be reversed in each cause, and the causes remanded, with costs, and with direction to dismiss both bills.