## VENTILATED CUSHION & SPRING CO. v. D'ARCY.

### (Circuit Court of Appeals, Sixth Circuit, December 7, 1915.)

### No. 2627.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—SPRING CUSHION.

The Stotts patent, No. 840,522, for a spring cushion for automobiles, cars, etc., is strictly limited by the prior art, which shows, in patents for beds and cushions, all of its elements, although not in precisely the same combination, and by the proceedings in the Patent Office, to the specific structure described, or its full equivalent. As so limited, *held* not infringed.

Appeal from the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Suit in equity by the Ventilated Cushion & Spring Company against Frank P. D'Arcy. Decree for defendant, and complainant appeals. Affirmed.

L. V. Moulton, of Grand Rapids, Mich., W. R. Rummler, of Chicago, Ill., and Cyrus W. Rice, of Grand Rapids, Mich., for appellant.

F. L. Chappell, of Kalamazoo, Mich., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. This is an appeal from the decree in an infringement suit in which the bill was dismissed. The patent in suit, No. 840,522, was issued to E. O. Stotts January 8, 1907, and through mesne assignments the appellant ultimately (August 8, 1907) succeeded to the title. The suit was commenced June 25, 1908, and the patent and all rights under it were acquired by the Jackson Spring Cushion Company April 16, 1913, when an order was entered authorizing the Jackson Company to prosecute the suit for its use in the name of the plaintiff. The pleadings are in form substantially the same as they usually are in patent cases, where issues of infringement and lack of invention through anticipation are joined.

The patent relates to spring structures. The main object of the patentee was to produce a structure which would be adapted particularly for cushions in seats of automobiles and other cars or carriages where the springs might be subjected to sudden and violent jarring. The exterior form of the structure comprises three sides of a quadrangle, a curved rear side, and the dimensions of an ordinary automobile cushion. The interior structure consists of two sets of spiral springs, one set being nearly twice the height of the other, and all are disposed in rows. According to the drawings and the exhibits in evidence, the long springs are each in the form of an hour-glass, and are disposed in four rows, running from front to rear, and parallel with the two straight sides of the structure; the upper and lower coils of the outside rows are each fastened to the adjacent parts of two border-frame wires which surround the structure, one being maintained in the plane of the top surface and the other in that of the bottom surface of the structure; the inner portions of such outside rows of coils are each fastened at the bottom to straight wires, called braces, disposed lengthwise along such rows, and extending from the front to a

point near the curved rear side of the border-frame wire, which is maintained, as stated, at the bottom of the structure; and the outer portions of each of the lower coils of the two interior rows are fastened to straight wires (braces), which are disposed between such rows similarly to the other braces just mentioned. The short springs, which are each frusto-conical in shape, are disposed in three rows, occupying the spaces between the lower coils, and also portions of the spaces embraced within such coils, of the adjacent long springs. The short springs are all fastened at their lower and upper coils, the former to the lower coils of the adjacent long springs, and the latter to connecting wires disposed upon the upper coils.

We have thus attempted to describe a model (an exhibit) of plaintiff's spring structure, called "Rough Rider," which, it will be seen, differs somewhat from the structure illustrated by the drawings accompanying the specification; still these drawings will serve to illustrate both of such structures. The drawings follow:

*Fig. 1.*

*Fig. 2*

*Fig. 4.*          *Fig. 5.*

*Fig. 3.*

It is stated in the specification that Fig. 1 "is a top plan of a cushion spring constructed according to this invention." Fig. 2 is an end elevation, Fig. 3 a plan showing the structure of the bottom, and Figs. 4 and 5 forms of attaching-clip designed to connect the adjacent wires. The numerals indicate: *1*, the long springs; *2*, the short springs; *3*, a metal wrapping to fasten the bases of adjacent springs; *4*, the lower border-frame wire; *5*, wire-clip to fasten the base of each of the outer springs to the border-frame wire; *6*, cross-wires, called a plurality of braces, which, with the wire-clip (*7*) to fasten such braces to the springs as shown in Fig. 3, are said to form a rigid base for the cushion; *8*, the upper border-frame wire; *9*, short helical springs connecting the top coils of the inner long springs as shown in Fig. 1; *10*, a wire frame disposed along and fastened by clips (*11*) to the top coils of the short springs as shown in Figs. 1 and 2.

The specification in substance states that the long springs ordinarily support the weight upon the cushion, but in case of a jar these springs at times yield sufficiently to bring the weight of the passenger upon the short springs; some of the witnesses saying that the short springs

are to prevent what is called "grounding," and the consequent discomforts, when traveling over a rough road. It is to be observed that the rough rider, above described, appears to be the plaintiff's preferred spring device; and that structure differs from the one shown in the drawings in these particulars: The braces are disposed perpendicularly to the front face instead of the sides; the helical springs (9) and the rear long spring of each of the outside rows are omitted; the omission of the helical springs is claimed to be justified, in view of the claims in suit; but metal sheet bands are added to and used to stiffen the bottom of the rough rider structure.

Judge Sessions, who decided the case below, was of the opinion that in view of the prior art, and the history of the patent itself as it is shown by the file wrapper, the claims were entitled only to a narrow construction, and consequently that the patent was not infringed. Concededly the component parts of the patented structure are old, but it is insisted that the structure as a whole is new. We assume, without deciding, that the patent is valid, and so shall confine the inquiry to the scope of the invention. The combinations of the claims in suit all concern a spring-cushion, and the elements may be conveniently considered according as they are there grouped and varied. The claims in issue are 1, 2, 6, 9, and 10. A fair understanding of all may be gathered from the first, with an accompanying statement showing in what respects the others differ from it. Claim 1 reads:

"In a spring-cushion, the combination of a plurality of spiral springs arranged in a plurality of rows, a second set of spiral springs of less height than those of the first set, and located in the spaces between the springs of the first set, the bottom convolutions of the springs of the first set being in contact with and secured to the bottom convolutions of adjacent springs of the second set, and co-operating to form a wire-network base."

The second claim is the same, except that it adds:

"A plurality of braces extending along said rows and fastened to said bottom convolutions to form a supporting-base for said springs."

The sixth claim substitutes two sets of "spiral furniture springs" for the springs mentioned in the first claim, and adds to the first claim:

"A system of wire bracing extending across said bottom convolutions secured thereto and co-operating therewith to form a stiff supporting-base of wire network."

The ninth claim differs from the first only in the statement that the form of the second set of springs is "frusto-conical." The tenth claim substitutes a "top frame yieldingly supported thereby" for the "plurality of rows" specified in the first claim; also, as respects the second set of springs, it states that each shall have "its bottom convolution extending into the space bounded by the periphery of the bottom convolution of one of the springs of the first set," and, after providing for the "wire-network base" as in the first, adds:

"Said springs and top being so disposed as to permit the top to be depressed a considerable distance without resistance by the second set and to cause such resistance when said top is further depressed."

Quite a number of observations are to be made upon these claims with respect to the prior art. In the first place, the idea of employing

229 F.—26

two sets of spiral springs of different heights for the purpose of adding to the normal resistance of the first set, also that of the second set when necessary, and of so adjusting such means of resistance according to the different weights that might be imposed, was disclosed in patent No. 83,489, to Hacker, in 1868. True, Hacker's invention concerned a "new and improved spring bed-bottom." However, apart from the obvious analogy between spring-cushions and spring bed-bottoms having similar springs, it is strenuously urged here that the excellence of plaintiff's rough rider spring-cushion is shown through its adoption by the Pullman Company for alternate use as seats or beds in its sleeping cars; and, besides, the sixth claim distinctly calls for "spiral furniture springs." Nothing more than Hacker's specification is needed to give point to the present relevancy of his invention:

"The spiral springs, A, being shorter, are only brought into action when the longer springs are compressed to a level with the shorter, and, by the further compression, the incumbent weight would rest on the cushions of the middle rail. The object of this invention is to adapt the bed-bottom to persons of varying weight, and to prevent sagging in the center, which is almost uniformly the case with spring-bottoms in use."

Hacker, it is also true, mounted his springs upon wooden slats; but this could not affect either the originality or the merit of his idea of associating long and short springs for purposes identical with those expressed in the patent in suit respecting the co-operating advantages of such springs; nor is it invention simply to substitute a metal base for a wooden one. Sheffield Car Co. v. D'Arcy, 194 Fed. 686, 692, 116 C. C. A. 322 (C. C. A. 6th Cir.). Still other inventions disclose association and use of spiral springs of different heights and in varying methods. For example, patent No. 179,257, to Birk, in 1876, for an improvement in bed-bottoms. Fig. 1, as the patentee states in his specification, shows "the springs at rest," when the top of the short spring is not in contact with the bed-bottom; but he says that Fig. 2 shows "all the springs in play to resist a greater weight." Patent No. 324,335, to Murray, in 1885, relating to "spring-seats," employs inverted conical springs, with a short spring disposed within each of the long springs, and, though this was the patentee's preferred method, he distinctly stated that the springs might be separately disposed. Patents No. 371,825, to Crocker & Diehl, in 1887, also No. 379,763, to them, in 1888, No. 396,272, to Diehl, in 1889, and No. 550,980, to Kohnle & Keeler, in 1895, all relate to associated long and short vehicle springs which were designed to adjust the spring resistance according to the loads imposed; and patent No. 561,139, to J. G. Smith, in 1896, discloses a double-decker spring bed-bottom, with short springs disposed directly under the long springs.

We may next turn attention to the supporting feature of the patented structure. In claims 1, 9, and 10, this is called a "wire-network base," while in claim 2 it is called a "supporting-base for said springs," and in the sixth claim "a stiff supporting-base of wire network." It is to be remembered that this support, regardless of the names applied to it in the claims, consists of the bottom spring convolutions, the lower border-frame, the braces, and the contrivances used to connect and

hold these parts in place. This operates as an efficient metal base; but metal bases, even wire bases, comprising bottom convolutions of spiral springs of uniform length disposed and held in rows, and, as a whole, fastened and sustained through metal, including wire, connections, and braces, were old at the time the present patent was issued. It can hardly be that the teachings of this feature of the old art in respect of springs of uniform length would not embrace also a union of springs of different lengths, for, as we have seen, the association of springs of different lengths as well as those of uniform length was old, and, above all, only the bottom convolutions are involved in the metal base now under consideration. The fact, then, that metal bases of the old art embrace bottom convolutions of spiral springs of any sort, tends strongly to show, if it does not conclusively show, that the base now in issue belongs to the old art, and at last is but a substitution of a metal base for a wooden base. That metal bases comprising bottom convolutions of spiral springs were old, as stated, may in part be seen, for instance, in patent No. 269,242, to J. G. Smith, in 1882, an improvement in bed-bottoms. It is quite plain, however, that the border-frames, which were to be maintained at the edges of and in the planes of the bottom and top surfaces, were iron rods, not wire. This is to be said, too, of patent No. 331,523, to Mellon, in 1885, for an improvement in spring beds; the springs are of the double-conical type, and are so constructed as to form the bottom and top convolutions into rings, but novelty in the springs is disavowed; and the plan of connecting spring to spring at their bottom convolutions, called end rings, and the springs to the bottom border-frame, appears not only in the drawings, but also in claims 2, 3, and 4.

Patent No. 458,067, to Purefoy, in 1891, relating to spring bed-bottoms, though declared to be adapted to "spring-seats and lounges," discloses a union of double-cone springs, disposed in rows, connected both longitudinally and transversely by braces fastened to the bottom and top convolutions of the springs; and certain of the springs are still further connected by double wire border-frames, to which such of the top and bottom convolutions as adjoin these borders are fastened. To the same effect are patents Nos. 486,184 and 593,781, to Purefoy, in 1892 and 1897. Patent No. 530,248, to Stoll, in 1884, discloses a plan of connecting the upper and lower convolutions of springs, which are disposed in rows and held in place by longitudinal and lateral wires that may be aptly called braces; and each of the upper and lower spring convolutions embraced in the rows overlaps its adjoining convolution, and so extends "into the space bounded by the periphery" of such convolution (see quoted portion of tenth claim in issue, supra). If we except this overlapping feature, the same thing may be said of the patent No. 654,756, to Hunt, in 1900, as we have said of the Stoll patent. It is probable, though not clear, that several of the devices last cited were designed to be used as upper surfaces, not as bases, of bed-bottoms; but, whether this was so or not, the parts shown were evidently calculated, as well as intended, to sustain substantial weights.

It is not necessary to continue a review of the prior art. It is not meant to say, however, that the organization of any of the structures

to which reference has been made was the same as that of the patented device; but it is meant to say that the manifest similarity in component parts described, in mode of operation, and in results sought, both in the patents of the prior art and in the patent in suit, is strongly suggestive of the exercise of skill, rather than the faculty of invention, in the latter patent; certainly there was but slight room left for invention.

It results that the prior art alone imposes substantial limitations upon each of the claims in issue, and to these limitations must be added the effect of certain acts of the patentee in securing the allowance of claims. The original application contained 9 claims, and they were all rejected except the eighth claim. This resulted in amendments of old claims and the presentation of new ones, and finally in the allowance of the 12 claims appearing in the letters patent. As to the claims in issue which were rejected, 1 and 9 were. amended by adding the words "and co-operating to form a wire-network base"; substantially the same words were inserted in claim 6 by amendment; 2 escaped amendment upon its being pointed out by applicant that it already had "the additional limitation of the braces fastened to the bottom convolutions"; 10 was afterwards presented and .allowed, but with the same words that were added to rejected claims 1 and 9. The true effect of these facts will be more fully appreciated by considering them in connection with certain other portions of the same claims. These claims each contain a provision which in substance requires "the bottom convolutions of the springs of the first set" to be "in contact with and secured to the bottom convolutions of the adjacent springs of the second set"; claims 2 and 6 also require that the braces they specify shall extend along the rows of bottom convolutions and be fastened to them; further, the specification states that the border-frame 4 "is fastened to the base of each of the outer springs by means of a wire-clip 5," and Fig. 3 of the drawings displays the resulting unitary character of the supporting base. The reasons for the introduction of such a supporting base as this will become apparent upon reading the grounds stated by the examiner, when rejecting all but one of the original claims:

"Claims * * .* are rejected as not distinguishing by any patentable novelty from the following patents: * * * Hacker shows applicant's arrangement of long and short springs. Birk shows the short springs with the large end down. Mellon exhibits springs attached to adjacent springs. Purefoy, Alvord, and Neider show springs united at their base convolutions."

We have already pointed out the features of the first four of the patents so referred to; the Alvord patent is not in evidence; but what the examiner said of the Neider patent is correct. It must therefore be concluded that the provisions so introduced concerning the supporting-base were at the time regarded as limitations and restrictions which were necessary alike to distinguish the claims from the prior art and to obtain the patent, and that each claim in issue was ultimately allowed and accepted upon this understanding.

Now, if there is. anything new in the combinations relied on, as counsel insist, it must be found in the supporting-base. It is to be ob-

served that the language of the amendment, "co-operating to form a wire-network base," relates to the co-operating effect of the bottom convolutions of the springs, which enter into the formation of the base, not to the co-operating effect, found in the old art, of uniting long and short springs for the purpose of adjusting their combined resistance to varying weights imposed upon them. The patentee simply brought the bottom convolutions closer together, and so grouped more springs within a given space than had been done before, since all the other features of the base, not to speak again of the forms of the springs themselves, were substantially the same as those disclosed in the old art; even the quality ascribed in the specification to the supporting-base—that it is "capable of yielding to a certain extent"—is not mentioned in any of the claims in suit or of the patent, and, indeed, such a claim would apparently have been inconsistent with the degree of rigidity wrought through the amendments made to the rejected claims. If upon any theory of patentable novelty this base can be effectively distinguished from the earlier metal bases, still it is most difficult to perceive, and it is not shown, how either the spring structure as an entirety or its component parts have been substantially changed in function, in principle of operation, or in the result produced, except in matter of degree. Adrian Wire Fence Co. v. United Fence Co., 223 Fed. 342, 345, 138 C. C. A. 604, and citations (C. C. A. 6th Cir.); U. S. Hame Co. Cases, 227 Fed. 876, —— C. C. A. ——, decided by this court November 12, 1915. This is not saying that the combinations relied on are in fact wholly lacking in patentable novelty; indeed, invention has been assumed, and, we may say, upon the theory that it is not necessary to pass upon that question, for, upon all the considerations stated, we are constrained to hold that, in order rightfully to accord validity to any of the claims in issue, they must be closely limited to the full equivalents of the specific structure which they, in connection with the specification and drawings, describe (Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 19, 23 Sup. Ct. 521, 47 L. Ed. 689; Ross-Moyer Mfg. Co. v. Randall, 104 Fed. 355, 359, 43 C. C. A. 578 [C. C. A. 6th Cir.]; Rich v. Baldwin, Tuthill & Bolton, 133 Fed. 920, 923, 66 C. C. A. 464 [C. C. A. 6th Cir.]; Sander v. Rose, 121 Fed. 835, 839, 840, 58 C. C. A. 171 [C. C. A. 8th Cir.]; Cumming v. Baker & Hamilton, 144 Fed. 395, 397, 398, 75 C. C. A. 373 [C. C. A. 9th Cir.]; McCarty v. Lehigh Valley Railroad Co., 160 U. S. 110, 119, 16 Sup. Ct. 240, 40 L. Ed. 358); and under this interpretation the charge of infringement is not sustained.

Defendant manufactures three structures which correspond more or less one with another, and in general appearance with the plaintiff's structures; yet there are substantial differences between the two sets of structures. Neither plaintiff's supporting-base with its essential parts, nor the wire-frame (*10*) disposed upon the top convolutions of the short springs, nor the short helical springs (*9*) used for connecting the upper convolutions of the long springs, appear in any of the defendant's devices. Defendant uses a mesh of small wires (crossing one another at right angles and engaging the border-frame) as a bottom surface, and another as a top surface, for each of its structures.

Similar wire-mesh constructions appear in patent for spring-seats, No. 324,335, to Murray, in 1885, and in patent for bed-springs, No. 819,671, to Pennepacker, in 1906; and it is not too much to say that meshwork of this character has been of common knowledge for many years. True, such mesh is "wire network," but not within the true intendment of that term as it was employed in the amendments to the claims of the patent in suit; for the use of the term had reference there to a specific base which was supposed to be an advance over the prior art. The upper and lower convolutions of the outside rows of defendant's long springs (which are of the hour-glass form) are woven into the mesh-work, though such convolutions are not· connected one with another; and the bottom convolutions of its short springs (which are of the hour-glass form and so unlike plaintiff's) are woven into the bottom mesh, but none of these convolutions is connected with the bottom convolution of any of the long springs, and thus defendant's short springs could, while plaintiff's could not, be removed without interfering with the rest of the construction. In one of defendant's devices, however, the bottom convolutions of some of the short springs slightly overlap like convolutions of some of the adjacent long springs, but this does not, nor do any of the other bottom convolutions, enter into or operate as part of the supporting-base; for in defendant's structures the mesh sustains the springs, while in plaintiff's the springs are made in essential part to sustain themselves. It might well be, it is true, that if plaintiff's patent could be treated as having made considerable advance over the prior art in matter of invention, it would be entitled to a range of equivalents which would include defendant's structures; but we need not repeat that the patent cannot be so treated. We think the case falls fairly within the rule laid down by this court in Rich v. Baldwin, Tuthill & Bolton, supra, 133 Fed. 924, 66 C. C. A. 464, and also by the Circuit Court of Appeals, Eighth Circuit, in Sander v. Rose, supra, 121 Fed. 840, 58 C. C. A. 171, since to find infringement here would be to ignore the limitations of the prior art, and particularly the effect of the patentee's acquiescence in the restrictions imposed upon his patent through rejection of his original, and subsequent allowance of his amended, claims. Royer v. Coupe, 146 U. S. 524, 532, 13 Sup. Ct. 166, 36 L. Ed. 1073; Computing Scale Co. v. Automatic Scale Co., 204 U. S. 609, 617, 27 Sup. Ct. 307, 51 L. Ed. 645; Campbell v. American Shipbuilding Co., 179 Fed. 498, 502, 103 C. C. A. 122 (C. C. A. 6th Cir.); XXth Century Heating Co. v. Taplin, Rice-Clerkin Co., 181 Fed. 96, 100, 101, 104 C. C. A. 156 (C. C. A. 6th Cir.).

The decree is affirmed, with costs.